**Luther M. RAGIN, Jr., Deborah Fish Ragin, Renaye B. Cuyler, Jerome F. Cuyler, Open Housing Center, Inc. and National Association for the Advancement of Colored People, Plaintiffs,**

v.

**HARRY MACKLOWE REAL ESTATE COMPANY, INC., the Harry Macklowe Organization, Harry Macklowe, Wilson Macklowe and Elfon Realty, Defendants.**

No. 88 Civ. 5665 (RWS).

United States District Court, S.D. New York.

Aug. 25, 1992.

Lefrak Newman & Myerson, New York City (Thomas A. Holman, Kerry Alan Scanlon, Marshall Beil, Alla Roytberg, of counsel), for plaintiffs.

Robinson Silverman Pearce Aronsohn & Berman, New York City (George B. Yankwitt, Vincent Alfieri, Suzanne M. Berger, Susan B. Teitelbaum, of counsel), for defendants.

## OPINION

SWEET, District Judge.

The plaintiffs, Luther M. Ragin, Jr., Deborah Fish Ragin, Renaye B. Cuyler, Jerome F. Cuyler (collectively, the "Individual Plaintiffs") and the Open Housing Center, Inc., (the "OHC") (the OHC and the Individual Plaintiffs are referred to collectively as the "Plaintiffs") seek declaratory and injunctive relief and compensatory and punitive damages against defendants The Harry Macklowe Real Estate Co. ("HMRE"), Harry Macklowe ("Macklowe"), and Elfon Realty Co. ("Elfon") (collectively, the "Defendants") arising out of their involvement in the publication of advertisements allegedly violative of § 804(c) of Title VIII (Fair Housing) of the Civil Rights Act of 1968, 42 U.S.C. § 3604(c) (1982) (the "Act" and "§ 3604(c)"). After a 14-day trial in which an advisory jury verdict was rendered in favor of the Plaintiffs and against HMRE, upon the facts and conclusions set forth below, judgment will be entered against Macklowe and HMRE jointly in favor of the Plaintiffs.

This is the first case of its kind to proceed to trial within this circuit, and, as far as it can be determined, only the third to reach this stage within the country. *See Fenwick–Schafer v. Sterling Homes,* 774 F.Supp. 361 (D.Md.1991); *Saunders v. General Servs. Corp.,* 659 F.Supp. 1042 (E.D.Va.1987). It is also one of ten cases filed by the Plaintiffs in this district charging various defendants with violations of § 3604(c) and other sections of the Act on the basis of housing advertisements for

which those defendants are allegedly responsible.

The case illustrates the intersection between two significant aspects of life in New York City: the advertising and obtaining of an apartment and the quest for racial integration. The question presented is whether the Defendants' real estate ads displaying exclusively white models indicated a preference as to race or color in violation of the Act and whether the Plaintiffs were injured by such a violation. Whereas a number of courts have grappled with and attempted to refine the legal contours of the Act, this court is now faced with the difficult task of applying these principles in the areas of liability, statute of limitations, injury, standing and damages.

*Prior Proceedings*

The complaint in this action was filed on August 12, 1988 (the "Complaint") and the amended complaint was filed on September 12, 1988 (the "Amended Complaint"). Discovery proceeded, but its progress was dependent on the resolution of a dispositive motion in a companion case, *Ragin v. New York Times Co.*, No. 89 Civ. 0228 (CSH). Pursuant to a ruling on a pretrial motion, discovery of the Defendants' net worth was deferred pending a jury determination as to the Plaintiffs' entitlement to punitive damages.

At the time of trial, the National Association for the Advancement of Colored People (the "NAACP"), which was originally named as a plaintiff, had not formally discontinued its action. Reference to it in the *voir dire* resulted in a mistrial and upon motion by the Plaintiffs it was dismissed with prejudice. The motion was granted on the condition that if it were later determined that the Plaintiffs are entitled to attorneys' fees, further inquiry would be made into the good faith nature of the motion. Wilson Macklowe, originally named as a defendant, was dismissed with prejudice, as were The Harry Macklowe Organization, a/k/a/ The Macklowe Organization, and Elfon. The plaintiffs' claims

under 42 U.S.C. § 3604(a), 42 U.S.C. § 1981 and 42 U.S.C. § 1982 were voluntarily dismissed with prejudice.

The trial was commenced on May 14, 1992 with a panel of nine jurors. In the course of the proceedings, it was necessary to discharge all but six of the jurors for cause. At this point, the wife of one of the remaining jurors suffered a serious illness requiring his support and assistance. In hopes that her condition would improve, the trial was adjourned for two weeks.

On June 23, 1992, the parties stipulated to be bound by a verdict of five jurors if another juror was lost and to a verdict by the court acting with an advisory jury if less than five jurors survived. Upon resumption of the trial with five jurors (the illness of the missing juror's wife having gotten worse rather than better), it was discovered that one of the remaining jurors, a lawyer, had failed to disclose that he had been disbarred. The juror was excused, and the trial thus proceeded before the court with an advisory jury. The advisory jury rendered its verdict on June 29, 1992,[1] finding that HMRE had violated § 3604(c) and that it was liable for compensatory damages of $25,000 to each of the Individual Plaintiffs and $100,000 to the OHC. The advisory jury also found HMRE liable for punitive damages in the amount of $62,500. Macklowe was not found liable.

Federal Rule of Civil Procedure 52(a) provides that, "[i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon...." Thus, although the verdict of the advisory jury may enlighten the court in discharging its ultimate responsibility, the "findings of fact [of the advisory jury] are not binding upon the trial court. Indeed the court is free to adopt its findings in whole or in part or to disregard them altogether." *Sheila's Shine Prods., Inc. v. Sheila Shine Inc.*, 486 F.2d 114, 122 (5th Cir.1973).

---

**1.** The Special Verdict Form completed by the advisory jury is attached as Appendix A to this opinion.

Final argument was held after briefing on July 17, 1992. Upon all of these proceedings, I reach the following findings of fact and conclusions of law.

*Findings of Fact*

The Parties

The Individual Plaintiffs are black residents of New York City.

Luther Ragin, 36, grew up in the Bronx, New York. He received a bachelor's degree from Harvard College and later completed a joint degree program in law and public policy at the Harvard Law School and the John F. Kennedy School of Government. In 1980 he joined the Chase Manhattan Bank in New York and in 1982 was sent to Chase's London office until 1985, when he returned to New York. Since January 1989, he has been Chief Financial Officer of Earl Graves Ltd., a minority-owned company. As CFO, Mr. Ragin is responsible for financial matters and operations of the company and its six subsidiaries. During the years relevant to this lawsuit, the Ragins' household income varied from $100,000 in 1986 to $130,000 in 1989.

Deborah Fish Ragin, 35, was born and raised in Cleveland, Ohio. Ms. Ragin graduated from Vassar College and received masters and doctorate degrees from Harvard University. After returning to New York from London with her husband, Ms. Ragin sought housing from late October 1985 through June 1986. Since late 1986, Mr. and Ms. Ragin have lived in a cooperative apartment located at 160 Cabrini Boulevard, New York in an apartment complex known as Castle Village. Mr. Ragin contracted to purchase the Castle Village apartment in March 1986. Ms. Ragin presently works at Beth Israel Medical Center.

Renaye Cuyler, 43, and Dr. Jerome Cuyler, 48, residents of Brooklyn since 1980, have been married for 20 years. Ms. Cuyler grew up in Williamsburg, Virginia, and came to New York to attend Adelphi University, from which she graduated in 1970. She received a masters degree in speech pathology from George Washington University in 1971, worked for several years as a speech pathologist at Harlem Hospital, and then as an administrator and teacher at Adelphi University. She received a J.D. degree from Fordham Law School and has been a practicing attorney ever since her graduation. In 1986 she established her own law firm specializing in personal injury litigation.

Jerome Cuyler was born and raised in Bayonne, New Jersey. He is a graduate of Marist College in Poughkeepsie, New York and received a degree in chemistry and a masters degree in biochemistry from Adelphi University while working full-time as a teacher of chemistry at CCNY and as a high school chemistry teacher in New York City. In 1976 he received his medical degree from Cornell University Medical College. After serving his residency at Harlem Hospital, Dr. Cuyler completed a postdoctoral fellowship at Albert Einstein College of Medicine in the Bronx. Presently, he is employed by Brooklyn Jewish Hospital as its Associate Director.

The OHC is a not-for-profit corporation headquartered in New York City. OHC provides a wide range of services with respect to housing in the New York metropolitan area, which include providing information, outreach, and investigation of complaints with respect to discriminatory practices in housing, producing approximately fifteen booklets dealing with housing opportunities and housing, conducting Fair Housing seminars throughout the New York City area, primarily among professionals and civil rights groups, and testifying before governmental agencies and meetings of various groups.

The OHC uses various methods in investigating discrimination. For instance, it conducts telephone interviews and investigates the ownership of certain buildings as well as pattern and practice cases. The "mission" of the OHC is to reduce the level of segregation in the residential housing market and to have a housing market free from discrimination of any kind. Phyllis Spiro ("Spiro") has served as the deputy director of the OHC for approximately fifteen years.

Defendant HMRE is engaged in management, construction and development of real

estate. At all relevant times, HMRE was the leasing agent and managing agent for the buildings Riverbank West and Riverterrace, as described *infra*. The defendant Harry Macklowe is, and at all relevant times has been, the sole owner and president of HMRE. Macklowe is also a general partner of Elfon, originally a defendant in this action, which owned Riverbank West until 1991, and of York 72 Associates, the owner of Riverterrace. Both Riverbank West and Riverterrace continue to be managed by HMRE.

The Buildings

The advertising at issue relates to two luxury rental complexes in Manhattan. The first, "Riverbank West," is located at 555 West 42nd Street and was owned by Elfon at the time the building was promoted.[2] Advertisements for Riverbank West appearing in *The New York Times* were paid for by Elfon. The second building, "Riverterrace," is located at 515 East 72nd Street, New York and is owned by York 72 Associates, a limited partnership of which Macklowe is general partner. Both buildings were and are managed by HMRE.

The Advertisements

Display advertising for Riverterrace commenced in early 1985 with the "Instant Landmark" series of advertisements published in *The New York Times*. These advertisements featured eight photographs, seven of the building itself and one of a view to the river, as well as text describing the architecture and the services and amenities offered by the building. They did not use any human images. The message conveyed was that the building was of architectural significance and offered extraordinary services and amenities.

Advertisements for Riverterrace continued to convey this message, but beginning in May 1986 and continuing until April 1987, the ads also featured photographs of white models. The following Riverterrace advertisements, all of which were either one-half or full-page ads, were published in *The New York Times* on the following dates:

| Date | Image |
|------|-------|
| Jan.–May 1985 | Instant Landmark |
| May 11, 1986 | HOME |
| Jan. 4, 1987 | New Year at 5:15 |
| Feb. 8, 1987 | Live It Up at 5:15 |
| Feb. 15, 1987 | 5:15 is the Time |
| Mar. 22, 1987 | 5:15 is the Time |
| Apr. 5, 1987 | 5:15 is the Time |

In addition to text describing the services available at Riverbank West, the "HOME" ad contained six photographs, three of single white models engaged in sports or leisure activities and one of a white couple embracing. "New Year at 5:15" depicted four white individuals gathered about a piano on New Year's Eve. "Live it Up at 5:15" displayed a photographic triptych: one photograph was the same as that featured in "New Year at 5:15," one was of two white individuals at a swimming pool and the third was of a white couple on a terrace. Finally, "5:15 is the Time," also contained three photographs: one a repeat of "New Year at 5:15," one of a white couple in a swimming pool and one of a single white model at a gym.

Riverbank West opened during the summer of 1987. Prior to its opening, there was a pre-opening advertising campaign. Two display layouts for that campaign were admitted into evidence. The first was a statement of policy by Elfon subscribed to by Elfon's partners, including the 42nd Street Development Corporation. The second was the "3–D" advertisement, a recreation of a famous, classic *Life* magazine image of an audience, comprised of 75 individuals wearing 3–D eyeglasses. All of the models in the "3–D" ad were white. All of these individuals were employees of either HMRE or Homer & Durham, the advertising agency which created the "3–D" ad. This layout appeared on three occasions: April 26, 1987, May 3, 1987 and May 17, 1987. The first two runs were full-page ads and the third was a half-page ad.

Admitted into evidence were six different layouts of advertisements for Riverbank West published in *The New York Times* after the building opened in the summer of

---

**2.** In December 1991, the ownership of Riverbank West was transferred to Massachusetts Mutual Life Insurance Company pursuant to a confirmed bankruptcy plan of reorganization.

1987. The following advertisements for Riverbank West appeared in *The New York Times* on the following dates as either full- or half-page ads:

| Date | Image |
|------|-------|
| Apr. 26, 1987 | 3–D |
| May 3, 1987 | 3–D |
| May 17, 1987 | 3–D |
| Aug. 30, 1987 | Lying on Beach |
| Sept. 6, 1987 | Lying on Beach |
| Sept. 13, 1987 | Beachbag |
| Sept. 20, 1987 | Beachbag |
| Sept. 27, 1987 | Beachbag |
| Oct. 4, 1987 | Beachbag |
| Oct. 11, 1987 | Lipstick |
| Oct. 18, 1987 | Lipstick |
| Oct. 25, 1987 | Lipstick |
| Nov. 1, 1987 | Lipstick |
| Nov. 22, 1987 | Lipstick |
| Nov. 29, 1987 | Lipstick |
| Dec. 6, 1987 | Lipstick |
| Feb. 7, 1988 | Lipstick |
| Mar. 6, 1988 | Skier |
| Mar. 13, 1988 | Skier |
| Apr. 17, 1988 | Lipstick |
| Apr. 24, 1988 | Lying on Beach |
| May 1, 1988 | "Get It" |
| May 22, 1988 | "Get It" |
| Sept. 25, 1988 | Beauty & the Best |
| Oct. 2, 1988 | Beauty & the Best |
| Nov. 6, 1988 | Beauty & the Best |
| Nov. 20, 1988 | Beauty & the Best |
| Dec. 11, 1988 | Beauty & the Best |

Each layout contained a single white human image. Specifically, "Lying on the Beach," which ran a total of three times, showed a young white woman basking in the sun beside an image of the building. "Beachbag," which appeared four times, featured a young white woman walking down the beach swinging a bag, with an image of the building rising out of the surf. "Lipstick," which ran a total of nine times, consisted of a photograph of a white woman's lips and fingers applying a lipstick in the shape of the building. "Skier," which was published two times, showed a white man skiing, with the building rising out of the mountains in the distance. "Get It," published twice, featured a white, bathing-suit-clad woman lying in the ocean in front of an image of the building. And "Beauty & the Best," which ran five times, depicted a glamorous white woman leaning toward a miniature image of Riverbank West. "Beauty & the Best," which ran from Sep-tember to December 1988 also contained an Equal Housing Opportunity logo.

Each image was provocative, striking, designed to grab a reader's attention and separate the advertisement from the "clutter" of the other advertisements for other developments. Each layout had a headline and information as to the rent for various available units. Each layout conveyed a message of affordability and luxury.

Macklowe, president of HMRE and general partner of Elfon and York 72 Associates, approved the concept advertising campaigns for Riverbank West and Riverterrace as well as the layouts for the display. He testified that he was "actively involved" in the advertising campaign. HMRE, through its officers Rosemarie Roberts ("Roberts"), Sheldon Werdiger ("Werdiger") and Macklowe, arranged for the publication of advertisements relating to the buildings. At the time the advertisements were developed and published, none of these individuals believed that the advertisements sent a message to the reader that blacks were preferred or dispreferred. At the time of trial, Roberts reached a different conclusion.

The advertising agency of Home & Durham created the "3–D" ad for Riverbank West. All of the other ads published in *The New York Times,* as well as certain other promotional material in evidence, were created by the advertising agency of Fisher Jackson Levy Flaxman ("FJLF"). A third advertising agency, McCaffrey and McCall ("M & M"), was hired by HMRE in late 1988 or early 1989 and created the last Riverbank West outdoor advertisements. Homer & Durham and FJLF are no longer in business.

The designated advertising agency created an advertising strategy and six or more layouts which it presented to Macklowe for approval. The purpose of the marketing effort in general and the advertising campaigns specifically was to attract attention to the particular advertisement and to stir the interest of the portion of the population which could afford to rent an apartment in the building advertised.

The advertising campaign for Riverbank West was intended to (i) attract attention to the advertisements by the use of provocative images and (ii) convey the message of affordability and luxury by the use of headlines, information and images and to distinguish the Riverbank West advertisements from the advertisements for other developments also published in *The New York Times*. Because the layouts were also to be used for outdoor advertising, the arresting nature of the image was particularly significant.

Both the Riverterrace and Riverbank West marketing strategies involved the use of prominent and oversized ads at the sites, direct mail, press releases, classified advertising, brochures, brokers and other promotions including outreach to U.N. missions, consulates, corporations, hospitals and universities—places one could expect to reach prospective tenants such as the Individual Plaintiffs. In discussing its advertising goals with the advertising agencies they employed, neither HMRE nor Macklowe made any request for images of human models of a particular race. HMRE and Macklowe did not select the images used in the layouts presented by the advertising agencies, either from stock photographs or from photographs sent by models' agents. HMRE was not consciously looking at racial features in selecting its images; instead its considerations were form, activity, interest and impact.

Riverbank West was also advertised on bus routes throughout Manhattan, including Harlem.

All human models used for advertisements for Riverterrace and Riverbank West, except those in the "3–D" ad, were selected from stock photographs which included non-white models.

The cost of advertising per building for one year ranged between one-half to one million dollars. The ads did not contain any terms or language explicitly or implicitly conveying a discriminatory message.

Criteria for Approving Tenants of Riverterrace and Riverbank West

HMRE used financial criteria for approving applicants for tenancies at Riverbank West and Riverterrace. In November 1988, the average monthly rent for all units at Riverbank West was $1,625.92 and the average minimum household income necessary to qualify for tenancy at Riverbank West was $56,907.20 per annum. In February 1987, the average monthly rent for all units at Riverterrace was $2,730.28 and the average minimum household income necessary to qualify for tenancy at Riverterrace was $114,671.76 per annum.

The relevant census data reflects that at or about the time the advertisements in evidence were published, there were approximately 2,792,614 households in New York City. Only 120,608 of those households had income above $50,000 per year and only 315,290 had income above $35,000 per year. Of the households in New York City with an income above $50,000 per annum, 6.57% were black. Of the households in New York City that had household income above $35,000 per annum, 10.67% were black. There was no census data for households in New York City at the relevant time that had income above $100,000 per annum.

Based upon data compiled for trial and not kept in the ordinary course by the Defendants, the racial composition of Riverbank West reflected a greater percentage of non-white, and in particular, black tenants, and a lower percentage of white tenants than would be expected based upon the census data. This data showed that the racial composition of Riverbank West from its opening through February 1989 was 67% white, 9% black, 7% Asian, 6% hispanic and 16% "unknown."

Plaintiffs' Exposure to the Defendants' Advertisements

Between 1986 and 1988, Ms. Cuyler saw a number of advertisements in *The New York Times* for Riverterrace and Riverbank West. With respect to Riverterrace, she saw the "HOME" ad on one occasion in May 1986 and "5:15 is the Time" on two occasions in the spring of 1987. With respect to Riverbank West, from April 1987 to October 1987, she saw the "3–D" ad on three occasions, "Beachbag" on two occa-

sions, "Lipstick" on two occasions, "Get It" on one occasion and "Beauty & the Best" on three occasions.

Ms. Cuyler testified that she was not offended by one advertisement containing a single white model but by the continued publication of such ads. Some time after May 1986, she discussed her reactions to these advertisements with Gail Wright, a friend and former staff attorney with the NAACP Legal Defense Fund, Inc. Ms. Cuyler testified that the ads caused her to recall the pain of growing up in a community that made distinctions based on color and that viewing their continued publication was "like rubbing salt in a wound." Ms. Cuyler testified that she does not feel her experience with discrimination is extraordinary or unique among blacks.

Dr. Cuyler saw the ads for the buildings on approximately sixteen occasions between 1987 and 1988. With respect to Riverterrace, Dr. Cuyler saw "5:15 is the Time" twice in the spring of 1987. With respect to Riverbank West, Dr. Cuyler saw the "3–D" ad on twice, "Lipstick" twice, "Lying on the Beach" once, "Beachbag" three times and "Beauty & the Best" four times. Dr. Cuyler also saw advertisements for the buildings on the sides of New York City buses.

Dr. Cuyler testified as to his reaction to the ads:

> The first time you see it, you don't make much of it, but as time goes on, the repetitiveness of the advertisement begins to drum a message home to you and after doing this for a while, it begins to become quite clear that this is not by happenstance. It's something that's designed to give a message. And the message that I got from that is that blacks and minorities were not very welcome in the particular area, or the particular buildings that these advertisements were [sic] represented.
>
> And the annoying thing about it.... it began to annoy me to know that over the space of a hundred and four advertisements, not one would bother to show a person of color.... So I got the mes-

sage and the message is irritating for myself....

Dr. Cuyler testified that he was concerned that his two children will be subjected to the same kind of discriminatory messages.

Luther Ragin testified that he first saw advertisements for Riverterrace in 1985 when, while the Ragins were living in London and planning to return to New York, his mother sent them copies of the Sunday real estate section of *The New York Times* and *New York* magazine. He testified that it was then he noticed that there were no black models in these advertisements. As the facts in evidence demonstrate, however, the only ads appearing during that period were those in the "Instant Landmark" series for Riverterrace. These ads contained no human models.

After the Ragins returned to New York, Mr. Ragin called Betty Hoeber ("Hoeber"), then OHC's executive director and a long-time friend of his parents, for suggestions about housing. He also discussed with her his reactions to some of the advertisements he had seen in *The New York Times.* He shared his concern with Ms. Hoeber that these advertisements showed only white people even when there were dozens of models in a picture.

During the period between March and December of 1986, when the Ragins had not yet closed on their Castle Village apartment, Mr. Ragin also saw a number of advertisements for Riverterrace in *New York Magazine.* He specifically recalled seeing two advertisements: one was "Live It Up at 5:15" and the other was called "Meet Me At 5:15." During this time, Mr. Ragin also saw the "HOME" advertisement for Riverterrace. He described the advertisement as a collage of pictures of five or six people "who are reflected in different positions, engaged in different activities associated with this particular development." During this period, advertisements for Castle Village also used the image of a single white model, although Mr. Ragin does not recall seeing such ads.

After the Ragins moved into Castle Village in December of 1986, they continued to keep an active interest in housing oppor-

tunities in the New York area and they regularly reviewed the Sunday *New York Times'* real estate section until (and after) the filing of this action. The evidence establishes that between May 1986 and December 1988, Mr. Ragin saw approximately twenty four ads for Riverterrace and Riverbank West. With respect to Riverterrace, Mr. Ragin saw "HOME" once in May 1986 and "5:15 is the Time" twice in the spring of 1987. With respect to Riverbank West, between 1987 and 1988 Mr. Ragin saw the "3-D" ad twice, "Lying on the Beach" twice, "Beachbag" twice, "Lipstick" nine times, "Skier" twice and "Beauty and the Best" four times.

When Mr. Ragin saw the "3-D" ad for Riverbank West for the first time on April 27, 1987, he was offended that an ad for a property on the west side of Manhattan which depicted so many human models would not have a single person of color. When he saw the same advertisement on the following Sunday, his reaction was exacerbated because it was no longer an isolated occurrence but a repeated publication that "suggest[ed] that there was a campaign of always excluding blacks in the depictions ... and signalled [to him] that this was not ... a complex which was ... desirous of attracting black applications."

When Mr. Ragin saw a half-page display advertisement for Riverbank West showing a woman walking on the beach on or about September 13, 1987, he noticed the absence of an Equal Housing Opportunity logo. Because this advertisement ran in conjunction with many other advertisements over a period of time as part of an advertising campaign for Riverbank West "which always and invariably used human beings, and those human beings were always and invariably white," this advertisement indicated a racial preference to him. He noted that these advertisements continued after the Plaintiffs filed an administrative complaint in June 1987. *See infra.*

Mr. Ragin testified that his reactions "come[] out of understanding what has been a history in [New York City] and in this country of long-standing housing discrimination and housing segregation." He testified that, "I didn't just wake up in the morning without these advertisements being in some context." In his opinion nearly every black person in the City of New York has had a personal experience with housing discrimination or has a relative or close friend who has had such an experience.

Ms. Ragin saw approximately sixteen *New York Times* advertisements for Riverterrace and Riverbank West between 1986 and 1988. With respect to Riverterrace, Ms. Ragin saw "5:15 is the Time" once in the spring of 1987. With respect to Riverbank West, Ms. Ragin saw the "3-D" ad three times, "Lying on the Beach" once, "Lipstick" six times and "Get It" twice. In addition, Ms. Ragin testified that she saw several advertisements for Riverterrace in *New York* magazine in 1986.

Ms. Ragin testified that she felt anger, disgust and humiliation at the continuous use of exclusively white models and that she discussed her reactions to these advertisements with her husband. She testified that she felt that "someone was trying to get across that black people were not to think of this as reasonable housing." The advertisements reminded her of her feelings of exclusion growing up in segregated Cleveland. She testified that the ads were humiliating because they conveyed to her that she was "not good enough to live somewhere, that there is something that impugns me as a person, which because they don't know me it has to be only based on my race."

Spiro testified that she first saw ads for the Macklowe buildings in 1986. Beginning in February 1987, Spiro, assisted by another employee of the OHC, collected, monitored and charted the Defendants' advertisements, as well as others considered to be discriminatory, on a daily basis. She attended a conciliation meeting at the New York State Division of Human Rights ("SDHR") where settlement of this matter was discussed but not reached. After the conciliation meeting, OHC continued to monitor the papers, collect the advertisements and chart them, and then decided to file this federal lawsuit.

Spiro devoted approximately 150 to 200 hours in investigating the claims underlying this lawsuit, which interfered with the work she normally does for OHC such as counseling clients, updating literature, investigating claims, conducting educational and outreach programs and supervising testing work. As a result of her efforts with respect to the Defendants' advertisements, she has had to turn down meetings, delay working on booklets and postpone other research and client work. The OHC did not send testers to either building and made no investigation as to their rental practices.

With respect to the ads' impact on the OHC's mission, Spiro testified that:

I think it did an enormous amount of damage to a fair housing agency whose goal is, on perhaps a more day-to-day level, of looking for housing. This makes it a battle you have to fight, in addition to the regular one, of providing the testers and helping people file complaints or explaining about the law.... Before you even set foot out to look for housing, you are receiving a message that there are places you are not welcome.... It is essential for people to have racially discriminatory choices that limit them removed. ... And images that are at them all the time, I think, damage them, and it damages the center because we're always telling people you have a right to live where you want with your money, when in fact a message like that says no, you don't, you're not welcome here. And so it frustrates us in what we're trying to tell our constituency....

Spiro further testified that she had no personal knowledge as to the impact of the Defendants' advertisements on anyone other than the Ragins and the Cuylers.

OHC, the only organization of its kind in the City of New York, had a three-person staff from 1986–1988 while it was researching and pursuing Riverterrace and Riverbank West complaints.

Administrative Proceedings Initiated by the Plaintiffs

In June 1987 the Plaintiffs filed a complaint with the SDHR against The Harry Macklowe Organization [3] alleging that it had engaged in an unlawful discriminatory practice. In addition, the SDHR commenced an administrative proceeding against the Harry Macklowe Organization. The administrative complaints, dated June 15, 1987, asserted that advertisements for Riverterrace and Riverbank West appearing in 1987 violated the New York State Human Rights Law because they did not contain black models. After being advised of the administrative complaint, Macklowe instructed HMRE's then in-house counsel to investigate and to ascertain the requirements of the relevant statutes.

On May 10, 1988, the SDHR issued findings of probable cause against The Harry Macklowe Organization and recommended a public hearing. There was no public hearing, and no further action appears to have been taken by or before the SDHR. After HMRE received the probable cause finding in late May 1988, all new layouts of advertisements published in *The New York Times* contained the Equal Housing Opportunity logo, although arguably not of the required size. Following the determination, an Equal Housing Opportunity logo was also affixed to existing bus posters. A radio advertisement for Riverbank West contained the Equal Housing Opportunity slogan and a video advertisements displayed the logo and showed a black man as one of four tenants using the health club facilities at Riverbank West. The *New York Times* advertisements thereafter published were not offensive to plaintiffs, and they did not see or do not recall the others.

The pages of *The New York Times* in evidence indicate that the other real estate advertisements published at the time of the advertisements challenged here also did not use black models and most did not have Equal Housing Opportunity logos. No evidence of intent to discriminate extrinsic to

---

3. The Harry Macklowe Organization is a trade name and has been dismissed from this litiga-tion.

the publication of the advertisements was adduced.

### Testimony as to the "Ordinary Reader"

In addition to the testimony of the Ragins, the Cuylers and Spiro, both sides offered expert testimony as to how the ads would be interpreted by the "ordinary reader."[4] No survey evidence was presented by either side.[5] William Allen ("Allen"), Plaintiffs' expert, is an expert in advertising in African–American and Hispanic markets. Based upon his years of experience advertising for those markets, blacks prefer ads that include black human models and may get a different message from advertisements that exclude black models.

Allen's testimony was counterbalanced by that of the Defendants' expert, Professor William Lee ("Lee"), a teacher and researcher in mass communications. Lee testified that in his opinion the Defendants' advertisements did not convey a racial dispreference for blacks for a number of reasons including the fact that the ads in question relate to a "high-involvement product" where the reader focuses less on the activity and complexion of the models and more on the information relating to the product itself. In the absence of any studies or scholarship on the subject, the expert testimony was evenly balanced. It was noted that white single-model ads appear in publications which are targeted for the black reader, some of which are published by a subsidiary of Earl Graves, Ltd. for which Luther Ragin serves as CFO.

The Defendants also offered the testimony of two black individuals, one of whom is a tenant at Riverbank West and the other of whom is a tenant at Riverterrace. Carol Allen, a Riverbank West tenant since 1989, testified that she had seen "Beachbag" and "Get It" on more than one occasion before renting in the building and did not find them racially offensive or exclusionary. Dr. Lloyd Gayle, a Riverterrace tenant since 1991, testified that he saw two of the advertisements and did not infer a racial message.

### Conclusions of Law

#### I. The Statute

Section 3604(c) provides that "it shall be unlawful—

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make such preference, limitation, or discrimination."

42 U.S.C. § 3604(c) (1982). Section 3612(a) provides a private right of action to enforce the rights granted by § 3604(c). *See* 42 U.S.C. § 3612(a) (1982).[6]

To prove a violation of § 3604(c), the Plaintiffs must have established by a preponderance of the evidence that the Defendants "ma[d]e, print[ed] or publish[ed] or cause[d] to be made, printed or published" the allegedly offending advertisement or advertisements and that such advertisement or advertisements "indicate[s]" an improper "preference" or intent to make such a preference.

The words "ma[d]e, print[ed] or publish[ed] or cause[d] to be made, printed or published" are to be given their ordinary meanings; that is, that a defendant itself, or through its agents, participated in designing, producing, revising, selecting, approving or paying for the advertisements. *United States v. Hunter*, 459 F.2d 205, 210 (4th Cir.), *cert. denied*, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972). An advertisement "indicates" a preference in violation of the statute if it "suggests to an

---

4. The "ordinary reader" is the standard by which a violation of § 3604(c) is to be determined. *See infra.*

5. Following the adjournment caused by juror unavailability, the Defendants sought to introduce survey evidence garnered during that period. The proffer was rejected as the population surveyed was limited, improperly in the view of the court, to those having the financial capacity sufficient to become renters in either Riverterrace or Riverbank West.

6. The Act was amended on September 13, 1988, effective March 14, 1989. Section § 3612(a) of the unamended Act, applicable here, has been recodified at § 3613(a) of the amended Act.

*ordinary reader* that a particular race is preferred or dispreferred for the housing in question." *Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir.) (hereinafter *"New York Times"*) (emphasis added), *cert. denied,* —— U.S. ——, 112 S.Ct. 81, 116 L.Ed.2d 54 (1991); *see also Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 646 (6th Cir.1991) (hereinafter *"HOME"*); *Fenwick–Schafer v. Sterling Homes Corp.*, 774 F.Supp. 361, 366 (D.Md.1991); *Hunter*, 459 F.2d at 215 (§ 3604(c) violated if "[t]o the ordinary reader the natural interpretations of the advertisements published ... is that they indicate a racial preference"). The "ordinary reader" is "neither the most suspicious nor the most insensitive of our citizenry. Such a reader does not apply a mechanical test to every use of a model of a particular race." *New York Times*, 923 F.2d at 1002.[7] Finally, an ad expresses a "preference" if "it would discourage an ordinary reader of a particular race from answering it." *Id.* at 1000.

Real estate advertisements using human models fall within the ambit of § 3604(c). Reasoning that neither the broadly drafted statute nor its legislative history "suggests that Congress intended to exempt from its proscriptions subtle methods of indicating racial preference," the Second Circuit has held that "in some circumstances" an ad using human models of one race to the exclusion of others may indicate a racial preference violative of § 3604(c), regardless of the absence of any facially discriminatory verbal message. *Id.; see also HOME*, 943 F.2d at 647–48 & n. 4 ("discrimination [under the FHA] may occur through words or pictures, and the use of all-white models could be factor in determining whether an advertisement conveys a discriminatory message...."); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 34–35 (D.C.Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 508, 112 L.Ed.2d 521 (1990); *Fenwick–Schafer,* 774 F.Supp. at 364–66; *Saunders*, 659 F.Supp. at 1058.

In reaching this determination, the Second Circuit drew support from a regulation issued by the Department of Housing and Urban Development ("HUD") promulgated under HUD's authority to enforce the Act. That regulation, the existence of which this court has taken judicial notice, provides:

*Use of human models.* Human models in photographs, drawings, or other graphic techniques may not be used to indicate exclusiveness because of race, color.... If models are used in display advertising campaigns, the models should be clearly definable as reasonably representing majority and minority groups in the metropolitan area.... Models, if used, should portray persons in an equal social setting.and indicate to the general public that the housing is open to all without regard to race, color ..., and is not for the exclusive use of such group.

24 C.F.R. § 109.30(b). The regulations of which this section is a part were designed to "provide guidance" to advertisers and are required to be applied only in HUD proceedings. The regulations do not create "fixed and immutable rules to determine whether an advertisement is discriminatory." *HOME*, 943 F.2d at 647. Nevertheless, a court may consider the regulations as examples of advertising that HUD considers might indicate a racial preference, limitation or discrimination to the ordinary reader. *See HOME*, 943 F.2d at 647–48 (citing legislative history at 45 Fed.Reg. 57,102 (Aug. 26, 1980)); *see also New York Times*, 923 F.2d at 1000 n. 1.

Proof that the advertiser had a racially discriminatory intent, although possibly relevant to determining the message conveyed, is not necessary: the touchstone is the message naturally inferred by the ordinary reader. *New York Times*, 923 F.2d at 1000; *see also Soules v. United States Dep't of Hous. & Urban Dev.*, 967 F.2d 817 (2d Cir.1992) (violation of § 3604(c) may be established either by proof that ad indicates impermissible racial

---

7. Although plaintiffs have urged that the challenged advertisements should be evaluated

through the eyes of the "ordinary *black* reader," there is no authority for this proposition.

preference to ordinary reader *or* by proof of actual intent to discriminate).

 The Plaintiffs also must have proved that at least one ad violative of the statute appeared within 180 days of the commencement of this action. *See* 42 U.S.C. § 3612(a) (1982) (providing statute of limitations for claims under § 3604 of 180 days after the occurrence of the allegedly discriminatory practice).[8] If it is established that an ad falling within the limitations period is "not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitation period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of the practice." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381, 102 S.Ct. 1114, 1125, 71 L.Ed.2d 214 (1982).

 Although viewed alone an ad constituting the "last asserted occurrence of the *practice*" may not violate the statute, once the continuing practice has been established, ads falling without the limitations period that are part of the same practice may be considered in reading the "timely" ads and may form the basis for the Fair Housing claims. *See Ragin v. Gilbert Charles Beylen, Inc.*, No. 89 Civ. 8558

(CSH), slip op. at 6–7, 1990 WL 4008 (S.D.N.Y. Jan. 17, 1990) ("advertisements are not regarded as unconnected, 'discrete' acts if they form part of a defendant's advertisement policy or practice. Viewed as a whole, that policy or practice may demonstrate a violation of section 3604(c), *even if a particular advertisement viewed alone would not*") (emphasis added); *Spann*, 899 F.2d at 34 n. 6 ("[I]t is highly unlikely that a single ad containing only white models could alone violate § 804(c)." However, where claim rests on "sheer numbers," it is proper to look to "defendant's conduct before the actionable period to show the violative character of defendant's conduct in that period."); *cf. New York Times*, 923 F.2d at 1001–02 ("close questions of liability will involve advertisers that either use a large number of models and/*or advertise repetitively*" (emphasis added)).

The sole requirement for standing to sue under § 3604(c) is "the Art. III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered 'a distinct and palpable injury.' " *Havens*, 455 U.S. at 372, 102 S.Ct. at 1121 (quoting *Warth v. Seldin*, 422 U.S.

---

**8.** Pursuant to an amendment to the Act dated September 13, 1988 and effective as of March 14, 1989, the limitations period has been enlarged to *two years* "after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a) (1988). However, the Plaintiffs have conceded that, for statute of limitations purposes, this amendment is not retroactive. *See* Plaintiffs' Points and Authorities on Punitive Damages and Retroactivity at 5 (May 12, 1992).

Even in the absence of Plaintiffs' concession of this point (which is suggested by their inconsistent insistence that the amendments *are* retroactive with respect to punitive damages), the amendments are not retroactive.

As noted by the parties in their ample briefing of the retroactivity question, the Supreme Court has established two apparently irreconcilable strains of law with respect to the retroactive application of statutes. The first, as set forth in *Bradley v. School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), provides that:

a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.

*Id.* at 711 n. 15, 94 S.Ct. at 2016 n. 15. The second, expressed in *Bowen v. Georgetown Univ.*

*Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), provides that "[r]etroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Id.* at 208, 109 S.Ct. at 471. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (recognizing, but refusing to resolve, tension between *Bradley* and *Bowen* ).

It is unnecessary to choose sides in the *Bradley/Bowen* debate, however, because prospective application of the amendments is indicated even under *Bradley:* the delayed effective date constitutes "statutory direction" that the amendments are to be applied prospectively only. *See Ragin v. Harry Macklowe Real Estate Co.*, 126 F.R.D. 475, 479 n. 1 (S.D.N.Y.1989); *Wong v. Human Resources Admin.*, 641 F.Supp. 588, 591 n. 2 (S.D.N.Y.1986); *Lewis v. Grinker*, 660 F.Supp. 169, 172 n. 5 (E.D.N.Y.1987); *Carl Marks & Co. v. U.S.S.R.*, 665 F.Supp. 323, 336 (S.D.N.Y.1987), *aff'd*, 841 F.2d 26 (2d Cir.), *cert. denied*, 487 U.S. 1219, 108 S.Ct. 2874, 101 L.Ed.2d 909 (1988); *Buccino v. Continental Assur. Co.*, 578 F.Supp. 1518, 1527 (S.D.N.Y.1983).

490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)); *see Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 103 & n. 9, 109, 99 S.Ct. 1601, 1609 & n. 9, 1612, 60 L.Ed.2d 66 (1979). Because "'Congress intended standing under § 812 to extend to the full limits of Article III,'" courts may not "create prudential barriers to standing in suits brought under that section." *Havens*, 455 U.S. at 372, 102 S.Ct. at 1121 (quoting *Gladstone*, 441 U.S. at 103 n. 9, 109, 99 S.Ct. at 1609 n. 9, 1612).

 Section 3604(c), which by its terms makes it unlawful to engage in certain conduct with respect to real estate advertising, is enforced through § 3612(a). That section states simply that "[t]he rights granted by section[ ] ... 3604 ... may be enforced by civil actions." 42 U.S.C. § 3612(a) (1982). Read together, these sections establish an enforceable right to nondiscriminatory real estate advertising. *Cf. Havens*, 455 U.S. at 373, 102 S.Ct. at 1121 (same, with respect to § 3604(d)). By virtue of its failure to limit the category of persons by whom this right may be enforced, Congress has conferred this right on all persons. *Cf. id.* at 373–74, 102 S.Ct. at 1121–22; *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206 (injury for purposes of Article III standing "may exist solely by virtue of 'statutes creating legal right, the invasion of which created standing'") (citation omitted); *compare* 42 U.S.C. § 3604(a) (limiting class of plaintiffs to those in housing market by making it unlawful "[t]o refuse to sell or rent *after the making of a bona fide offer*" (emphasis added)). Thus, a plaintiff who proves that she read the challenged advertisements and that the advertisements would indicate a racial preference to the ordinary reader "has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions." *Id.; see*

*also Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209–11, 93 S.Ct. 364, 366–68, 34 L.Ed.2d 415 (1972); *New York Times*, 923 F.2d at 1005 ("[A] claimant may establish a prima facie case for such damages simply by oral testimony that he or she is a newspaper reader of a race different from the models used and was substantially insulted and distressed by a certain ad.").[9]

This definition of standing to sue for a violation of § 3604(c) is confirmed by the holding in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, in which the Supreme Court analyzed analogous language in § 3604(d) in determining standing under that section. Section 3604(d) makes it unlawful "[t]o represent to any person because of race ... that any dwelling is not available for inspection, sale or rental when such dwelling is in fact so available." The Court held that, in conjunction with § 3612(a), this section "conferred on all 'persons' a legal right to truthful information about housing." *Id.* at 373, 102 S.Ct. at 1121. Given Congress's intent, the Court rejected the claim that a plaintiff must be in the market for the subject housing in order to have standing to sue under the statute. *Id.* at 373–74, 102 S.Ct. at 1121–22. The Court thus held that a "tester," who "may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home," had standing by virtue of her allegation that her statutorily created right to truthful housing information was violated. *Id.* at 374, 102 S.Ct. at 1121. *See also Gladstone*, 441 U.S. at 111–15, 99 S.Ct. at 1614–15.

Were the standing inquiry not so confined, prudence would counsel heavily in favor of limiting the class of persons in-

**9.** This is not to say that the violation of an enforceable statutory right *per se* is compensable by damages, that is, absent proof of some resultant injury. *Cf. Memphis Comm. School Dist. v. Stachura*, 477 U.S. 299, 308–10 & n. 11, 106 S.Ct. 2537, 2543–45 & n. 11, 91 L.Ed.2d 249 (1986) (absent proof of some "actual injury" compensatory damages "based on some unde-

finable 'value' of infringed rights" not appropriate means of vindicating deprivation of constitutional right actionable under 42 U.S.C. § 1983); *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978) (without proof of actual injury, deprivation of right to procedural due process actionable for nominal damages not compensatory damages).

jured under § 3604(c) to those who (1) were in the market for the housing advertised at the time they viewed the challenged advertisements and (2) were deterred from pursuing the housing advertised by the message conveyed by and inferred from the ad.

Such a definition would be consistent with the Act's purpose, which is to protect against conduct which, either intentionally or in effect, impedes integration and/or perpetuates segregation and discrimination in housing. *See* 42 U.S.C. § 3601 (policy of Act is "to provide, within constitutional limitations, for fair housing throughout the United States"); *United States v. Starrett City Assocs.*, 840 F.2d 1096, 1103 (2d Cir.) (Newman, J., dissenting) ("Congress enacted the Fair Housing Act to prohibit racial segregation in housing."), *cert. denied*, 488 U.S. 946, 109 S.Ct. 376, 102 L.Ed.2d 365 (1988); *Otero v. New York City Housing Authority*, 484 F.2d 1122, 1134 (2d Cir. 1973) (goal of Act is to promote "open, integrated residential housing patterns and to prevent the increase of segregation ... of racial groups"). It seems eminently logical, therefore, to require the Individual Plaintiffs to show that the ad influenced them in some way that adversely affects the racial balance of the housing advertised. *Cf. Banks v. Heun–Norwood*, 566 F.2d 1073, 1076–77 (8th Cir.1977) (plaintiff not entitled to bring Title VII claim for employment discrimination absent allegation that she was deterred from responding to job ad).[10]

■ An organizational plaintiff such as the OHC can prove standing to sue on its own behalf by demonstrating that it sustained actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision. *See Havens*, 455 U.S. at 378–79, 102 S.Ct. at 1124–25; *Valley Forge Christian College v. Americans*

*United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Injury in fact can be established by proof that the defendant's "purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action," *Spann*, 899 F.2d at 27; *see Havens*, 455 U.S. at 379, 102 S.Ct. at 1124, such as "checking or neutralizing the ads' adverse impact," "devot[ing] more time, effort and money to endeavors designed to educate," *Spann*, 899 F.2d at 27; *see HOME*, 943 F.2d at 646, or " 'devoting significant resources to identify and counteract' [the] allegedly discriminatory advertising practices and ... such practices ... frustrated the organization's 'efforts to assist equal access to housing through counseling and other referral services'...." *Saunders*, 659 F.Supp. at 1052 (quoting *Havens*, 455 U.S. at 379, 102 S.Ct. at 1125). A simple "setback to the organization's abstract social interests" does not constitute injury. *Havens*, 455 U.S. at 379, 102 S.Ct. at 1124.

## II. Application of the Law to the Facts

### A. The Plaintiffs Proved that the Defendants Violated § 3604(c)

■ A total of six advertisements for Riverbank West appeared in *The New York Times* between February 15, 1988 and August 12, 1988, the limitations period in this case. These ads were based on four different layouts: "Skier," "Lipstick," "Lying on the Beach," and "Get It" (the "Limitations Period Ads"). As discussed above, each of these ads featured a single white model and none contained racially discriminatory language. The proof at trial established that each of the Plaintiffs viewed at least some of these ads during the actionable period.

---

**10.** As it stands, the boundaries of the class of potential plaintiffs are as expansive as a publication's distribution. This assessment is not based on mere conjecture. Shortly after the announcement of the advisory jury verdict, the following letter, dated July 21, 1992, was received in chambers:

> Dear Judge Sweet:
> I'm one of the blacks who was discriminated [sic] by Harry Macklowe real estate. Would you please send me a Cliams [sic] form or write and tell me can get one. Thank you very much.
> Sincerely,
> /s/ James Ford

The Limitations Period Ads were part of an advertising campaign for Riverbank West and Riverterrace that began in 1985 and continued into the limitations period. The evidence demonstrates that HMRE managed and arranged for the advertising of both buildings, that Macklowe personally was "actively involved" in the advertising efforts and that all of the ads were designed and produced according to the same concept. Because the evidence thus established that at least one ad appeared within the limitations period and that the Limitations Period Ads were part of an allegedly unlawful continuing advertising practice, it is appropriate to consider pre- and post- limitations period ads both as independent bases of the Plaintiffs' claims and in evaluating the message conveyed by the Limitations Period Ads.[11]

The Plaintiffs proved by a preponderance of the evidence that HMRE, through its agents, arranged for the ads and that Macklowe was actively involved in conceptualizing and approving the ads as president of HMRE and general partner of Elfon and York 72 Associates, the entities that owned the buildings and, in the case of Elfon, paid for the ads.

Although claims alleging violations of § 3604(c) based solely on the use of human models present considerable problems for the trier of fact, the Plaintiffs have also proved that, viewing the ads as many times and over the same period as they did, an ordinary reader would naturally interpret the ads to "indicate" a racial preference. The Second Circuit has suggested some reference points in making this determination:

> An ad depicting a single model or couple of one race that is run only two or three times would seem, absent some other direct evidence of an intentional message, outside Section 3604(c)'s prohibitions as a matter of law. A housing complex that runs ads several times a week for a year depicting numerous white models as consumers and black models as doormen or custodial employees would have difficulty persuading a trier of fact that its ads did not facially indicate a racial preference. It thus seems inevitable that the close questions of liability will involve advertisers that either use a large number of models and/or advertise repetitively. In such cases, the advertisers opportunities to include all groups are greater, and the message conveyed by the exclusion of a racial group is stronger.

*New York Times*, 923 F.2d at 1002.

The majority of the Defendants' ads seen by the Plaintiffs, including the Limitations Period Ads, featured only a single white model. Moreover, as found above, none of the ads contained a discriminatory verbal message and the Plaintiffs did not prove that the Defendants possessed extrinsic racial intent. On this basis, the Defendants urge that the language of *New York Times* counsels that the court find no violation of § 3604(c) as a matter of law.

Without deciding the question, the Defendants' argument might prevail were the Limitations Period Ads the only advertisements under consideration. These single-model, facially neutral ads, appeared only six times and were seen by each of the Plaintiffs no more than three times. Nevertheless, as concluded above, the court may consider all of the ads in evidence which are part of the Defendants' continuing practice.

[redacted] Testimonial evidence as to the ordinary reader's natural interpretation of the ads was sparse. Due to the Plaintiffs' commitment to their cause and heightened sensitivity attributable to an awareness of historical patterns of housing discrimination and personal experiences with segregation, testimony as to their reactions to the ads can be given only qualified weight in determining the ordinary reader's interpretation. As found above, the testimony of the two expert witnesses was in equipoise.

11. Having reached this conclusion, it is unnecessary to consider the Defendants' contention that the Plaintiffs have failed to state a claim upon which relief can be granted based on the Limitations Period Ads alone.

The testimony of Riverbank West tenant Carol Allen and of Riverterrace tenant Dr. Gayle is of only limited significance in determining whether the ordinary reader would infer a racial preference from the ads because they did not view the same variety or number of ads over the same duration as did the Plaintiffs. Allen, for instance, testified only that she had seen "Lying on the Beach," "Beachbag" and "Get It." Dr. Gayle testified that he saw only two ads for Riverterrace. Moreover, these witnesses' *post hoc* recollection of their reaction to these ads must be qualified by their obviously positive experiences living in the buildings.

Finally, evidence of the racial constituency of the buildings, though probative of the lack of any extrinsic racial intent by the Defendants, is not probative of the ordinary reader's interpretation of the ads. There was no evidence that any of the tenants (other than Ms. Allen and Dr. Gayle) read the ads before renting their units.

The relative paucity of relevant objective testimony on this question does not, of course, impugn the evidentiary significance of the ads themselves.[12] Furthermore, the verdict of the advisory jury, a body comprised of individuals of both sexes and various "races," "colors" and "national origins," presumed to be ordinary readers, must be given substantial weight.

None of Defendants' ads using a single white model (such as the Limitations Period Ads) or even a small group of white models (such as "HOME" or "5:15 is the Time") read alone would indicate an impermissible racial preference to the ordinary reader, as the Plaintiffs themselves conceded in their testimony. However, the ads cannot be read singly in determining their message because each is informed by the cumulative message of the campaign of which it was a part. Looking to the ads seen by the Plaintiffs, they formed a pattern in which, without exception, at least one human model was featured and in which that model or those models were exclusively white, and, conversely, never black. Each of the Plaintiffs viewed these ads at least fourteen times (Ms. Cuyler) and as many as twenty-four times (Mr. Ragin) between 1986 and 1988. Included in the ads seen by the Plaintiffs was the "3–D" ad, which featured an audience of 75 people, none of whom were black.

Given this pattern, an ordinary reader who had viewed the pre-Limitations Period Ads as frequently as did the Plaintiffs would naturally infer from these ads, the single-model Limitations Period Ads and the post-Limitations Period ads that white individuals were preferred as tenants at Riverterrace and Riverbank West. *See New York Times*, 923 F.2d at 1002 ("It thus seems inevitable that the close questions of liability will involve advertisers that *either* use a large number of models and/*or advertise repetitively*. In such cases, the advertisers opportunities to include all groups are greater, and the message conveyed by the exclusion of a racial group is stronger."). I therefore conclude that the Plaintiffs have proved by a preponderance of the evidence that the Defendants violated § 3604(c).

**B. The OHC Has Standing and Both the Individual Plaintiffs and the OHC Were Injured by the Ads**

Based on the facts found above, the Individual Plaintiffs have proved that they were injured by the Defendants' ads in that they received ads violative of their right to nondiscriminatory real estate advertising which caused them substantial offense and emotional distress.

The Defendants argue that the OHC lacks standing to sue and thus that its claims must be dismissed. As discussed above, an organization has standing to sue on its own behalf if it proves actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court

---

**12.** Indeed, given the extremely fact-specific nature of the inquiry as to whether an advertisement or group of advertisements viewed by a plaintiff would indicate a racial preference to the ordinary reader it seems likely that such evidence will be rare.

decision. The Defendants contend that the OHC failed to adduce proof at trial that it has suffered injury in fact as a consequence of Defendants' advertising. I disagree.

Through the testimony of Ms. Spiro, the OHC established that some of its resources were diverted or expended in connection with the Defendants' advertising practice and independent of this lawsuit. Ms. Spiro herself spent 150 to 200 hours engaged in such activities as monitoring and charting ads thought to be discriminatory, including the Defendants', and attending an SDHR conciliation meeting regarding the Defendants' ads. Ms. Hoeber also participated in the monitoring effort, as did an assistant of Ms. Spiro's. The OHC has established that these activities relating to "identify[ing] and counteract[ing]" the Defendants' advertising practices detracted the attention of OHC staff members from their regular tasks at the OHC. Thus, the OHC has established that it was injured by Defendants' advertisements and that it has standing to sue on its own behalf. *See Havens*, 455 U.S. at 379, 102 S.Ct. at 1125; *Saunders*, 659 F.Supp. at 1052.

. The OHC has not established, however, that its efforts to assist equal access to housing have been frustrated by the Defendants' ads. Although Spiro testified generally that advertising like Defendants' damages the OHC's mission, there was no evidence that the OHC was forced to increase its educational, counselling or referral services due to the Defendants' ads in particular. According to Spiro's testimony, except for the Ragins and the Cuylers, the OHC received no complaints about the Defendants' ads and Spiro conceded that she was unaware of the impact of Defendants' ads on anyone other than the Individual Plaintiffs.

*Remedies*

Section 3612(c) of the unamended Act, applicable here, provides that:

The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual damages and not more than $1000 punitive damages, together with court costs and reasonable attorney fees in the case of a prevailing plaintiff: *Provided,* That the said plaintiff in the opinion of the court is not financially able to assume said attorney's fees.

42 U.S.C. § 3612(c) (1982).

Compensatory Damages

As correctly foreseen by our Court of Appeals, § 3604(c) poses "[t]he potential for large numbers of truly baseless claims for emotional injury ..., and there appears to be no ready device, other than wholly speculative judgments as to credibility, to separate the genuine from the baseless." *New York Times*, 923 F.2d 995 at 1005. The Second Circuit has thus recognized the problematic nature of claims under § 3604(c) and has expressed "confiden[ce] that courts will be able to keep such awards within reason." *Id.* The conclusions reached here represent an effort to justify that confidence.

The Individual Plaintiffs

The Individual Plaintiffs seek compensatory damages for emotional distress caused by the deprivation of their right to nondiscriminatory real estate advertising. Damages for such an intangible injury are compensable under the Act. *See Saunders*, 659 F.Supp. at 1061 (awarding plaintiff $2500 for "distress" caused by housing brochure); R.G. Schwemm, *Housing Discrimination: Law and Litigation* § 25.-3(2)(b), at 25–18 & n. 84 (1990) (citing cases); *cf. New York Times*, 923 F.2d at 1005. As in any case, however, an award of such damages must be supported by competent evidence of the injury as well as a causal connection between the defendant's conduct and the injury.

The sole evidence of the emotional distress suffered by the Individual Plaintiffs came from the testimony of the Individual Plaintiffs themselves. Their testimony credibly established that they took offense at the ads and that the indignation, humiliation and distress they suffered was directly attributable, at least in part, to the Defendants' conduct. Nevertheless, in determin-

ing whether, and in what amount, compensatory damages are appropriate, the following factors must be taken into consideration.

First, the testimony of Mr. Ragin and Dr. Cuyler revealed that the Individual Plaintiffs' reactions relate to an aggregation of advertisements, only some of which were for the Defendants' buildings. Mr. Ragin testified, for instance, that he first became aware of the Defendants' use of exclusively white models while in London in 1985. However, the only advertisements for Riverterrace [13] appearing in 1985 were those in the "Instant Landmark" series, a campaign that featured no human models. Similarly, Dr. Cuyler testified that "it began to annoy me to know that over the space of *a hundred and four advertisements*, not one would bother to show a person of color." As found above, the Individual Plaintiffs viewed far fewer than 104 advertisements for the Defendants' buildings.

Second, the reactions of the Individual Plaintiffs were based in large part on past experiences and personal sensitivity to racial issues. Ms. Cuyler, for instance, likened the effect of Defendants' ads to "rubbing salt in a wound"—the "wound" having been created by her childhood experiences with racism. Likewise, Ms. Ragin's reaction was augmented by her feelings of exclusion growing up in segregated Cleveland. And Mr. Ragin testified that his reactions "come out of understanding what has been a history in [New York City] and in this country of longstanding housing discrimination and housing segregation.... I didn't just wake up in the morning without these advertisements being in some context." These events, while undoubtedly creating pain, were not proximately caused by the Defendants.

Finally, while there is no doubt that the Individual Plaintiffs were offended by the Defendants' ads, they have not established that the ads have caused them to suffer profound emotional distress. Based on the testimony, none of the Individual Plaintiffs feels further inhibited or deterred by his or her experience with these ads from seeking housing wherever desired. None sustained depression that has affected their relationships, ability to work or ability to function. Finally, with respect to the Ragins in particular, in evaluating the level of their distress, it is significant that they purchased a co-op at Castle Village, a housing complex which also published advertisements featuring only white models. Their failure to recall those ads weakens the credibility of the distress allegedly caused them by the Defendants.

In view of the foregoing, compensatory damages of $2500 are hereby awarded to each Individual Plaintiff.

### The OHC

█ As concluded above, the OHC was forced to devote resources to identifying and counteracting Defendants' advertising practices and these resources were diverted from the OHC's normal activities. The testimony established that Spiro devoted approximately 150 to 200 hours to this end, aided at times by Ms. Hoeber and an assistant. Based on this diversion of resources, the OHC is entitled to $20,000 in compensatory damages.

### Punitive Damages

██ The Plaintiffs also seek punitive damages. Such damages are appropriate only upon proof that the Defendants acted wantonly or willfully or maliciously or with actual knowledge or reckless disregard that their actions violated a federally protected right. *See Fenwick–Schafer*, 774 F.Supp. at 366; *Saunders*, 659 F.Supp. 1042. Because the Plaintiffs have failed to prove that the Defendants possessed any such states of mind, punitive damages are not warranted.

As found above, the evidence does not support a finding that the Defendants acted with racially discriminatory intent. To the contrary, evidence such as the racial composition of Riverbank West relative to the eligible percentage of the black population as well as the testimony of Carol Allen and Dr. Gayle tends to negate such a find-

---

**13.** Riverbank West was not advertised until 1987.

ing. Lacking evidence of intent, a finding of wanton, willful or malicious behavior cannot be supported.

■ The Plaintiffs contend, however, that the Defendants' continued publication of ads containing only white models after learning of the filing of the administrative complaint in June 1987 and after the SDHR's determination of probable cause in May 1988 constitutes such behavior.

This contention fails for three reasons. First, the filing of an administrative complaint and the issuance of a determination of probable cause do not establish the "violation of a federal right." The probable cause determination concluded merely that "no Blacks were used as human models" and that there was probable cause to support the allegations of the complaint. Second, even if this determination were to be treated as evidence of a violation of a federal right, the evidence establishes that, although he did not believe that he or HMRE had violated the law by the ads, Macklowe subsequently took steps to enlighten himself through counsel as to whether the advertisements violated the Act. Finally, following the SDHR determination, the Defendants included an Equal Housing Opportunity logo in their print and bus ads and included a verbal advisory to this effect in radio ads.

Injunctive Relief

■ The Plaintiffs also seek an injunction requiring the Defendants (1) to comply with the Act and conduct all future advertising practices in a manner that does not violate the Act and (2) to include in all future ads black human models (of various specified numbers or percentages of the total number of models shown, depending on the type of ad), to portray black human models in an equal social setting with white human models and to include an Equal Housing Opportunity logo in accordance with 24 C.F.R. 109.30.

A court may award affirmative injunctive relief to remedy past discriminatory practices if it believes that "vestiges of prior discrimination linger and remain to be eliminated." *Hunter*, 459 F.2d at 220 n. 1, *quoted in Saunders*, 659 F.Supp. at 1060.

A court should not grant injunctive relief unless "there exists some cognizable danger of recurrent violation." *Saunders*, 659 F.Supp. at 1060 (citation omitted).

Although the advertising campaigns for Riverterrace and Riverbank West have ended, the Defendants' persistent and uniform practice of advertisements featuring only white models to the exclusion of models of other races leads me to believe that "some cognizable danger of recurrent violation" exists. This situation is thus distinguishable from that in *Saunders* where no such danger was found because, subsequent to the acts that formed the basis for the litigation, the defendants had revised the challenged brochure to increase the use of black models. *See Saunders*, 659 F.Supp. at 1060.

Consistent with the findings and conclusions in this opinion, the Defendants are hereby ordered and enjoined to comply with the Act and conduct all of their future advertising practices in a manner that does not discriminate on the basis of race. Such compliance includes the use of non-white human models adequate to prevent any ads, in any media, from indicating any preference, limitation, or discrimination based on race to the ordinary reader.

The Plaintiffs have provided no authority, however, for their request that the court direct the specific racial content of future ads published by the Defendants. Indeed, the requirement of proportional racial representation "has been rejected as both ... unworkable ... and an unjustifiable interpretation of § 3604(c)." *Housing Opportunities Made Equal v. Cincinnati Enquirer*, 731 F.Supp. 801, 803–04 (S.D.Ohio 1990). Although "[i]njunctive relief should be structured to achieve the twin goals of insuring that the Act is not violated in the future and removing any lingering effects of past discrimination," *Marable v. Walker*, 704 F.2d 1219, 1221 (11th Cir.1983), there is no evidence on this record that proportional racial representation is either necessary to prevent an ad from indicating a racial preference to the ordinary reader or that it will in fact do so. *Cf.* 24 C.F.R. § 109.30 ("If models are used

**1236**

in display advertising campaigns, the models should be clearly definable as *reasonably representing* majority and minority groups...."). Finally, the dangers inherent in such an approach seem obvious, particularly in a city so racially, nationally and ethnically diverse as New York. Assuming that proportional representation were the answer, the problem is hardly solved by an injunction addressed only at blacks and whites. By entering such an injunction, it seems, the court itself would become an abettor to discrimination against other groups.

*Conclusion*

Upon the findings and conclusions set forth above, judgment will be entered granting declaratory and injunctive relief and compensatory damages against Macklowe and HMRE jointly in favor of the Plaintiffs. Submit judgments on notice.

It is so ordered.

## APPENDIX A
### SPECIAL VERDICT FORM

1. Please indicate beside the name of each respective defendant whether that defendant made, printed or published or caused to be made, printed or published any advertisements of which the plaintiffs complain.

| | | | | |
|---|---|---|---|---|
| Harry Macklowe Real Estate Company, Inc. | YES | ✓ | NO | |
| Harry Macklowe | YES | | NO | ✓ |

If your answer to Question 1 is "No" with respect to any defendant or defendants, STOP here with respect to that defendant or those defendants. If your answer to Question 1 is "Yes" with respect to any defendant or defendants, proceed to Question 2 with respect to that defendant or those defendants.

2. Please indicate whether any of the defendants as to which you answered "Yes" to Question 1 above made, printed or published or caused to be made, printed or published any advertisement or advertisements on or after February 15, 1988 and before August 12, 1988 that an "ordinary reader" would understand as indicating a racial preference, limitation or discrimination.

 YES ✓ NO ___

If your answer to Question 2 is "No," STOP and proceed to the STOP instruction at the end of this form.

3. Please indicate whether any of the defendants as to which you answered "Yes" to Question 1 above committed acts after February 15, 1988 and before August 12, 1988 that violated section 3604(c) and caused injury to any of the plaintiffs. Please indicate your answer beside the name of each respective plaintiff.

| | | | |
|---|---|---|---|
| Luther M. Ragin, Jr. | YES | ✓ | NO ___ |
| Deborah Fish Ragin | YES | ✓ | NO ___ |
| Renaye B. Cuyler | YES | ✓ | NO ___ |
| Jerome F. Cuyler | YES | ✓ | NO ___ |
| Open Housing Center, Inc. | YES | ✓ | NO ___ |

If your answer to Question 3 is "No" with respect to any plaintiff or plaintiffs, STOP here with respect to that plaintiff or those plaintiffs. If your answer to Question 3 is "Yes" with respect to any plaintiff or plaintiffs, proceed to Question 4 with respect to that plaintiff or those plaintiffs.

4. Please indicate the amount of nominal or actual and compensatory damages, if any, to which each of the plaintiffs is entitled as a consequence of any violation of § 3604(c) either on or after February 15, 1988 or as part of a continuing pattern or practice. You may indicate an amount only for that plaintiff or those plaintiffs for whom you have checked "Yes" in Question 3.

| | |
|---|---|
| Luther M. Ragin, Jr. | $ 25,000.00. |
| Deborah Fish Ragin | $ 25,000.00. |
| Renaye B. Cuyler | $ 25,000.00. |

| | |
|---|---|
| Jerome F. Cuyler | $ 25,000.00. |
| Open Housing Center, Inc. | $100,000.00. |

Proceed to Question 5.

5. Are any or all of the plaintiffs entitled to punitive damages against the defendants as to which you answered "Yes" in Question 1?

| | | | |
|---|---|---|---|
| Harry Macklowe Real Estate Company, Inc. | YES | ✓ NO | ___ |
| Harry Macklowe | YES | ___ NO | ✓ |

STOP. Please sign as indicated and notify the Marshall that you have reached a verdict.

(s) Edward G. Davis
Foreman