6 F.3d 898
 Luther M. RAGIN, Jr., Deborah Fish Ragin, Renaye B. Cuyler,
Jerome F. Cuyler, Open Housing Center, Inc.,
Plaintiffs-Appellants-Cross-Appellees,
v.
HARRY MACKLOWE REAL ESTATE CO., Harry Macklowe,
Defendants-Appellees-Cross-Appellants.
 Nos. 1423, 1424, Docket 92-9252L, 92-9282XAP.
 United States Court of Appeals,
Second Circuit.
 Argued May 14, 1993.
Decided Sept. 29, 1993.
 
 Kerry Alan Scanlon, Washington, DC (Elaine R. Jones, Eric Schnapper, NAACP Legal Defense and Educational Fund, Inc., New York City, Cornelia Pillard, NAACP Legal Defense and Educational Fund, Inc., Washington, DC, Thomas Holman, Alla Roytberg, Lefrak Newman & Myerson, New York City, of counsel), for plaintiffs-appellants-cross-appellees.
 George B. Yankwitt, New York City (Vincent Alfieri, Suzanne M. Berger, Susan B. Teitelbaum, Robinson Silverman Pearce Aronsohn & Berman, of counsel), for defendants-appellees-cross-appellants.
 William H. Jeffress, Jr. and Niki Kuckes, Washington, DC (Miller, Cassidy, Larroca & Lewin, of counsel), submitted a brief for amicus curiae National Fair Housing Alliance in Support of plaintiffs-appellants-cross-appellees.
 Before: PRATT and MINER, Circuit Judges, and MISHLER, District Judge.*
 MINER, Circuit Judge:
 
 
 1
 Plaintiffs-appellants-cross-appellees Luther M. Ragin, Jr., Deborah Fish Ragin, Renaye Cuyler, Jerome F. Cuyler and the Open Housing Center ("OHC") appeal from a judgment entered in the United States District Court for the Southern District of New York (Sweet, J.) after a bench trial with an advisory jury. The plaintiffs commenced this action for damages and injunctive relief in August of 1988, alleging that defendant-appellee-cross-appellant Harry Macklowe Real Estate Company ("HMRE") and HMRE's sole owner and president, defendant-appellee-cross-appellant Harry Macklowe, violated section 804(c) of the Fair Housing Act, 42 U.S.C. Sec. 3604(c) (1988) (the "FHA" or the "Act"). The gravamen of the plaintiffs' complaint was that the defendants' placement of display advertising for residential apartments in The New York Times violated the Act's prohibition against racial discrimination in residential housing advertising because all the models portrayed in the advertisements were white.
 
 
 2
 After a fourteen-day trial, the advisory jury recommended: that only HMRE be found liable for violating the Act; that each individual plaintiff receive $25,000 in compensatory damages for emotional distress; that the OHC receive $100,000 in compensatory damages for the resources it was required to allocate to counteract the effects of the defendants' advertisements; and that HMRE be required to pay $62,500 in punitive damages to the plaintiffs. On August 25, 1992, the district court issued an opinion: finding that both HMRE and Macklowe violated the Act; awarding each individual plaintiff $2500 in compensatory damages for emotional distress; and awarding the OHC $20,000 in compensatory damages for the resources it was required to allocate to counteract the effects of the defendants' advertisements. SeeRagin v. Harry Macklowe Real Estate Co., 801 F.Supp. 1213, 1230-34 (S.D.N.Y.1992). The district court declined to award punitive damages but entered an injunction prohibiting the defendants from violating the Act by using display advertising that indicated a racial preference.
 
 
 3
 In its August 25 opinion, the district court directed the parties to "[s]ubmit judgments on notice." 801 F.Supp. at 1236. Both parties subsequently submitted proposed judgments based on the court's opinion. Each judgment included a provision contemplating further proceedings to determine if attorneys' fees would be awarded. In October of 1992, the district court entered a judgment in accordance with its decision. The judgment granted costs and disbursements to the plaintiffs but, in accordance with an order dated October 19, 1992 denying counsel fees, omitted any fee award.
 
 
 4
 In their appeal, the plaintiffs argue that the district court erred in: calculating the amount of compensatory damages; declining to award punitive damages; issuing a weaker injunction than they requested; and declining to award them attorneys' fees. In their cross appeal, the defendants argue that the district court erred in finding that the plaintiffs had standing to sue in federal court and in finding that the defendants violated the Act. For the reasons set forth below, we affirm the district court's findings with respect to standing, liability and damages, leave the injunction undisturbed and reverse and remand on the issue of attorneys' fees.
 
 BACKGROUND
 
 5
 We assume familiarity with the facts set forth in the district court's published opinion, seeRagin v. Harry Macklowe Real Estate Co., 801 F.Supp. 1213 (S.D.N.Y.1992), and therefore provide only a brief summary of the facts and circumstances giving rise to this action. The individual plaintiffs are two married couples who reside in New York City. All four are African Americans who hold graduate degrees in the fields of law, public policy, medicine or speech pathology. The OHC is a nonprofit corporation located in New York City. Its "mission" is to reduce the amount of segregation in, and to eliminate all discrimination from, the metropolitan residential housing market.
 
 
 6
 HMRE was the leasing agent and managing agent for two luxury residential apartment complexes in Manhattan. The first building, Riverterrace, is located at 515 East 72nd Street. Between May of 1986 and April of 1987, HMRE placed six half-page or full-page display ads for Riverterrace in The New York Times. One of these ads ("HOME") featured a photograph of three single white models engaging in sports or recreational activities and a photograph of a white couple embracing. A second ad ("New Year at 5:15") portrayed four white models gathering around a piano on New Year's Eve. A third ad ("Live It Up at 5:15") included three photographs: the scene depicted in the New Year at 5:15 ad, two white models at a swimming pool and a white couple on a terrace. The last three ads ("5:15 is the Time") also each included three photographs: the scene featured in the New Year at 5:15 ad, a white couple in a swimming pool and a white model at a gym.
 
 
 7
 The second building, Riverbank West, is located at 555 West 42nd Street. Between April of 1987 and December of 1988, HMRE placed twenty-eight half-page or full-page display advertisements for Riverbank West in The New York Times. Three of the ads ("3-D") featured a recreation of a famous Life magazine photograph depicting a movie audience of seventy-five white men and women wearing 3-D eyeglasses. All the individuals pictured in the 3-D ad were employees of either HMRE or the advertising agency that created the ad. Three advertisements ("Lying on Beach") depicted a young white woman lying in the sun next to an image of Riverbank West. Four ads ("Beach Bag") showed a young white woman walking on a beach and swinging a bag with an image of Riverbank West rising out of the surf. Nine of the ads ("Lipstick") depicted a white woman's lips and fingers applying a lipstick in the shape of Riverbank West. Two ads ("Skier") featured a white man skiing against a background of mountains among which was nestled Riverbank West. Two of the ads ("Get It") depicted a white woman wearing a bathing suit and lying in the ocean in front of an image of Riverbank West. The remaining five advertisements ("Beauty & the Best") showed a glamorous white woman "leaning toward a miniature image of Riverbank West." 801 F.Supp. at 1221. The Beauty & the Best ads ran from September to December of 1988 and were the only HMRE advertisements that included an Equal Housing Opportunity logo.
 
 
 8
 The target group for Riverterrace consisted of individuals in the thirty-five to fifty-five-year-old age group with household incomes in excess of $75,000. The target group for Riverbank West consisted of individuals in the twenty-five to forty-five-year-old age group with household incomes in excess of $50,000. All the human models for these advertisements were chosen from stock photograph books, which included both black and white models. The defendants never requested that black models be used in, or excluded from, the display ads for the two buildings.
 
 
 9
 In addition to placing ads in the print media, HMRE also advertised the two buildings by using direct mail, press releases, classified advertising, on-site brochures and signs, and radio advertisements and by placing ads on the sides of buses, which ran throughout Manhattan, including Harlem. None of the ads contained any language that either explicitly or implicitly conveyed a discriminatory message. Finally, there was no evidence presented that the defendants discriminated against minorities in the leasing of apartments in the two buildings.
 
 
 10
 The plaintiffs saw the defendants' ads in The New York Times between August of 1985 and late 1988. In June of 1987, the plaintiffs filed a complaint with the New York State Division of Human Rights ("SDHR") against The Harry Macklowe Organization (the "Organization").[1] In their SDHR complaint, the plaintiffs alleged that the Organization had engaged in unlawful, discriminatory housing practices. In response to the plaintiffs' administrative complaint, the SDHR initiated an administrative proceeding against the Organization. The administrative complaints were dated June 15, 1987, and contained allegations that the display advertisements for Riverbank West and Riverterrace appearing in 1987 violated the New York State Human Rights Law because they did not include any black models. After receiving notice of the administrative complaints, Macklowe directed HMRE's in-house counsel to conduct an investigation of their obligations under the relevant housing statutes.
 
 
 11
 On May 10, 1988, the SDHR issued a finding of probable cause against the Organization and recommended that a public hearing be held to determine if further action was warranted. A public hearing never was held, and no further administrative action was taken by the SDHR. After HMRE received notice of the probable cause finding in May of 1988, all new layouts of display ads published in The New York Times included the Equal Housing Opportunity logo, which apparently was smaller than the size prescribed by United States Department of Housing and Urban Development ("HUD") regulations. See 24 C.F.R. Sec. 109.30(a) & app. I (1992). The logo also was placed on the existing bus posters, and a radio advertisement for Riverbank West included the Equal Housing Opportunity slogan. A video advertisement for Riverbank West also displayed the logo and showed a black man using the health club with three other tenants.
 
 
 12
 The evidence introduced at trial indicated that the other real estate advertisements published on the same pages of The New York Times as the HMRE display ads also did not use black models and that most of the ads did not have the Equal Housing Opportunity logo. In addition to the testimony of the individual plaintiffs that they were offended when they saw these ads over a period of time, both sides presented expert testimony concerning whether the "ordinary" reader would view the defendants' ads as expressing a racial preference. The defendants also offered the testimony of a black tenant from each of the two buildings. Both tenants testified that they saw some of the defendants' ads but did not believe that they conveyed a racially exclusionary message.
 
 
 13
 At the conclusion of the trial, the district court entered judgment for the plaintiffs; awarded less compensatory damages than those recommended by the advisory jury; declined to award punitive damages; entered an injunction prohibiting the defendants from continuing to use display ads that expressed a racial preference; and declined to award attorneys' fees. Both sides timely appealed.
 
 DISCUSSION
 A. Standing
 
 14
 Section 804(c) of the FHA provides that it shall be unlawful
 
 
 15
 [t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.
 
 
 16
 42 U.S.C. Sec. 3604(c) (1988). Section 813(a) of the Act provides a private right of action to enforce the rights granted by section 804(c). See id. Sec. 3613(a)(1)(A).
 
 
 17
 In those instances in which Congress expressly grants a private right of action to a class of persons to enforce a federal right, those persons have standing to sue in federal court so long as they satisfy the case or controversy requirement of Article III, viz., alleging "that [they] personally [have] suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); see alsoLujan v. Defenders of Wildlife, --- U.S. ----, ----, 112 S.Ct. 2130, 2145, 119 L.Ed.2d 351 (1992). With these principles in mind, we turn to the defendants' arguments that neither the individual plaintiffs nor the OHC has standing to sue in federal court.
 
 1. Individual Plaintiffs
 
 18
 The defendants argue in their cross appeal that the individual plaintiffs have suffered no injury because they were not in the market for housing when they saw these ads but instead actively were combing the newspapers looking for these ads in order to bring a section 804(c) action. For the purpose of our discussion, we will assume that the plaintiffs were not actively looking for an apartment when they viewed the defendants' ads.[2]
 
 
 19
 The Supreme Court addressed the issue of private party standing to sue in FHA actions in Havens Realty Corp. v. Coleman, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). In Havens Realty, the defendants argued that "testers"--individuals who, without the intent to rent an apartment, pose as renters for the purpose of collecting evidence of unlawful steering away of prospective minority purchasers by real estate agents--lacked standing to sue for violations of section 804(d) of the Act. Section 804(d) makes it unlawful for a person "[t]o represent to any person because of race ... that any dwelling is not available for ... rental when such dwelling is in fact so available." 42 U.S.C. Sec. 3604(d) (emphasis added). The Court rejected the defendants' argument and held that a tester who "may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home," had standing to sue by virtue of his allegation that his statutorily created right to truthful information about the availability of housing was violated. Havens Realty, 455 U.S. at 374, 102 S.Ct. at 1121. The Court based its conclusion on the long-held principle that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.' " Id. at 373, 102 S.Ct. at 1121 (quoting Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)); see alsoLujan, --- U.S. at ----, 112 S.Ct. at 2145.
 
 
 20
 Here, Judge Sweet found that "a plaintiff who proves that she read the challenged advertisements and that the advertisements would indicate a racial preference to the ordinary reader 'has suffered injury in precisely the form the [FHA] was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions.' " 801 F.Supp. at 1229 (quoting Havens Realty, 455 U.S. at 373-74, 102 S.Ct. at 1121). We agree. There is no significant difference between the statutorily recognized injury suffered by the tester in Havens Realty and the injury suffered by the Ragins and the Cuylers, who were confronted by advertisements indicating a preference based on race. SeeSaunders v. General Servs. Corp., 659 F.Supp. 1042, 1053 (E.D.Va.1987). Given the private attorney general provision in section 813(a) of the Act and the Supreme Court's holding in Havens Realty, the district court was constrained to find that the individual plaintiffs had standing to bring this action in federal court.
 
 2. OHC
 
 21
 The defendants also argue that the OHC does not have standing to bring this action in federal court on its own behalf. Like an individual plaintiff, an organization must show actual or threatened injury in fact that is "fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C.Cir.), cert. denied, 498 U.S. 980, 111 S.Ct. 508, 509, 112 L.Ed.2d 521 (1990); seeHavens Realty, 455 U.S. at 378, 102 S.Ct. at 1124 ("[h]as the plaintiff ' "alleged such a personal stake in the outcome of the controversy" as to warrant [the plaintiff's] invocation of federal-court jurisdiction?' " (citations omitted)). Conversely, "an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).
 
 
 22
 In Havens Realty, the Court also discussed the criteria for an organization to have standing to bring an FHA claim on its own behalf. The Court held that a perceptible impairment of a housing organization's ability to provide counseling and referral services constituted an actionable injury in fact. SeeHavens Realty, 455 U.S. at 379, 102 S.Ct. at 1124 ("[s]uch concrete and demonstrable injury to the organization's activities--with the consequent drain on the organization's resources--constitutes far more than simply a setback to the organization's abstract social interests"). The Court based its conclusion on the following allegation pleaded in the plaintiff's complaint:
 
 
 23
 Plaintiff ... has been frustrated by defendants' racial steering practices in its efforts to [obtain] equal access to housing through counseling and other referral services. Plaintiff ... has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices.
 
 
 24
 Id.
 
 
 25
 Here, the injury sustained by the OHC as a result of the defendants' advertisements was documented by the trial testimony of Ms. Phyllis Spiro, the deputy director of the OHC. Ms. Spiro testified that the services offered by the OHC included providing information at community seminars about how to fight housing discrimination. Spiro testified that she and her small staff devoted substantial blocks of time to investigating and attempting to remedy the defendants' advertisements. For example, Spiro detailed the steps she took to file the administrative complaint with the SDHR, including identifying the buildings' developers, the marketing agent and the advertising agent, as well as attending a conciliation conference. Spiro also testified that the time she and her coworkers spent on matters related to this case prevented them from devoting their time and energies to other OHC matters. Finally, Spiro testified that she personally devoted 150 to 200 hours working on this case after the Ragins filed their complaint in federal court.
 
 
 26
 The district court concluded that the OHC established that its "activities relating to 'identify[ing] and counteract[ing]' the Defendants' advertising practices detracted [sic] the attention of OHC staff members from their regular tasks at the OHC." 801 F.Supp. at 1233 (quoting Havens Realty, 455 U.S. at 379, 102 S.Ct. at 1124). We agree. Spiro's testimony demonstrated that the OHC was forced to "devote significant resources to identify and counteract" the defendants' advertising practices and did so to the detriment of their "efforts to [obtain] equal access to housing through counseling and other referral services." Havens Realty, 455 U.S. at 379, 102 S.Ct. at 1124; see alsoVillage of Bellwood v. Dwivedi, 895 F.2d 1521, 1526 (7th Cir.1990) ("the only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination"). That some of the OHC staff's time was spent exclusively on litigating this action does not deprive the organization of standing to sue in federal court. SeeSaunders, 659 F.Supp. at 1052. Having decided that the plaintiffs had standing to bring this action, we now proceed to address the merits of this appeal.
 
 B. Liability
 
 27
 Two years ago, in Ragin v. New York Times Co., 923 F.2d 995, 999 (2d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 81, 116 L.Ed.2d 54 (1991), we held that a plaintiff could bring an action against a defendant for violating section 804(c) of the Act if the defendant's housing ads "suggest[ed] to an ordinary reader that a particular race [was] preferred or dispreferred for the housing in question," regardless of the defendant's intent, id., at 1000. We defined the ordinary reader as "neither the most suspicious nor the most insensitive of our citizenry. Such a reader does not apply a mechanical test to every use of a model of a particular race." Id. at 1002. Although we indicated that the intent of the defendant "may be relevant to a factual determination of the message conveyed," the message conveyed to the ordinary reader was the "touchstone" of our inquiry. Id. at 1000.
 
 
 28
 In concluding that the defendants' display ads violated the FHA, the district court found that
 
 
 29
 HMRE, through its agents, arranged for the ads[,] ... that Macklowe was actively involved in conceptualizing and approving the ads as president of HMRE ... [and] that, viewing the ads as many times and over the same period as they did, an ordinary reader would naturally interpret the ads to 'indicate' a racial preference.
 
 
 30
 801 F.Supp. at 1231. The district court based these findings both on the fact that there were no black models in any of the ads, including the ad portraying seventy-five movie viewers, and on the number of occasions (between fourteen and twenty-five) when the individual plaintiffs viewed the ads between 1986 and 1988. Seeid. at 1232. Moreover, the district court noted that the advisory jury's finding of liability also was probative of the ads' effect on the ordinary reader. Seeid.
 
 
 31
 In reaching its conclusion, the district court did not rely on the expert testimony presented by the parties, finding such testimony to be inconclusive. Seeid. at 1231. The district court also gave limited weight to the individual plaintiffs' testimony because of their "commitment to their cause and heightened sensitivity attributable to an awareness of historical patterns of housing discrimination and personal experiences with segregation." Id. The district court declined to credit the testimony of the two black residents living in the defendants' buildings because "they did not view the same variety or number of ads over the same duration as the Plaintiffs" and because their testimony was affected by their experiences after having lived in the buildings. Id. at 1232. Finally, the district court declined to consider evidence of the racial composition of Riverterrace and Riverbank West because that evidence was "not probative of the ordinary reader's interpretation of the ads." Id.
 
 
 32
 In their cross appeal, the defendants argue that the district court erred in finding them liable for violating section 804(c) because the plaintiffs failed to present any expert testimony or survey evidence regarding whether the ordinary reader (rather than the ordinary black reader) would find that their ads indicated a racial preference; there was no evidence of discriminatory intent on their behalf; and there was no evidence that the ads had a discriminatory effect on the racial composition of their buildings. We find these arguments to be unpersuasive.
 
 
 33
 We never have held that a plaintiff is required to submit survey evidence or expert testimony to prove whether the ordinary reader would find an advertisement to express a racial preference, and we decline to do so here. Defendants' reliance on our requirement that plaintiffs submit such evidence to prove confusion in trademark infringement cases, see, e.g.,Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp., 960 F.2d 294, 298 (2d Cir.1992), is misplaced. In trademark infringement cases, the inquiry focuses on whether there is a likelihood that a defendant's mark will confuse a group of customers. Id. at 297-98. In contrast, the inquiry directed by Ragin is whether a hypothetical ordinary reader would find that a defendant's ads expressed an impermissible racial preference. Like the inquiry in negligence cases concerning whether a defendant's conduct conformed with that of the reasonable person, this question is one that the factfinder can answer by viewing the ads and the defendants' conduct and then applying common sense. Cf.Washington Hosp. Ctr. v. Butler, 384 F.2d 331, 336 (D.C.Cir.1967) (no need for expert testimony to resolve issue that would not "extend the jury beyond the range of ordinary lay knowledge and experience"). No expert testimony or survey evidence is necessary, although such evidence no doubt is admissible.
 
 
 34
 In Ragin we explicitly rejected the argument that a showing of discriminatory intent or discriminatory effect is required to prove a prima facie violation of section 804(c). See 923 F.2d at 1000 (intent is relevant but not dispositive). Our holding in Soules v. United States Department of Housing & Urban Development, 967 F.2d 817 (2d Cir.1992), does not, as defendants argue, require a showing of intent. Relying on Ragin, the Soules court observed that "factfinders may examine intent, not because a lack of design constitutes an affirmative defense to an FHA violation, but because it helps determine the manner in which a statement was made and the way an ordinary listener would have interpreted it." Id. at 825 (emphasis added). Here, Judge Sweet considered the defendants' lack of discriminatory intent and the absence of any discriminatory effect in determining liability and still concluded that an ordinary reader would find that their ads expressed a racial preference. We agree with that conclusion. SeeSaunders, 659 F.Supp. at 1058 ("plaintiffs need not establish that defendants intended to express a racial preference" to prove that the Act was violated).
 
 C. Compensatory Damages
 
 35
 When a district court sits as a factfinder, we will reverse its computation of damages only if they are clearly erroneous. United States Naval Inst. v. Charter Communications, Inc., 936 F.2d 692, 697 (2d Cir.1991); see Fed.R.Civ.P. 52(a). Plaintiffs' attempt to characterize the district court's damages findings as a remittitur of the advisory jury's recommendations does not change this standard. As the Fifth Circuit observed almost twenty years ago:
 
 
 36
 [A district court] is not bound by the findings of the advisory jury, which it is free to adopt in whole or in part or to totally disregard.... Hence our concern with the trial court's findings is not whether they dovetail perfectly with the jury verdict. We are concerned rather with whether those findings pass muster under the "clearly erroneous" standard of [Fed.R.Civ.P.] 52(a)....
 
 
 37
 Sheila's Shine Prods., Inc. v. Sheila Shine, Inc. 486 F.2d 114, 122 (5th Cir.1973) (citation omitted); see alsoMallory v. Citizens Utils. Co., 342 F.2d 796, 797 (2d Cir.1965) ("When an advisory jury is used, the 'review on appeal is from the court's judgment as though no jury had been present.' " (quoting (American) Lumbermens Mut. Casualty Co. v. Timms & Howard, Inc., 108 F.2d 497, 500 (2d Cir.1939))); 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Sec. 2335, at 126 (1971) ("it is wholly in [the district court's] discretion whether to accept or reject, in whole or in part, the verdict of the [advisory] jury"). Having articulated the proper standard of review, we proceed to address the plaintiffs' arguments.
 
 1. Damages Awarded to Individual Plaintiffs
 
 38
 It is axiomatic that civil rights plaintiffs may recover compensatory damages for emotional distress. See, e.g.,Baskin v. Parker, 602 F.2d 1205, 1209 (5th Cir.1979) (per curiam); Fort v. White, 530 F.2d 1113, 1116 (2d Cir.1976); Steele v. Title Realty Co., 478 F.2d 380, 384 (10th Cir.1973). The district court awarded $2500 to each of the four individual plaintiffs to compensate them for the emotional distress they suffered as a result of viewing the defendants' ads. In determining the damages suffered by the individual plaintiffs, the district court found that "[t]heir testimony credibly established that they took offense at the ads and that the indignation, humiliation and distress they suffered was directly attributable, at least in part, to the Defendants' conduct." 801 F.Supp. at 1233. However, the district court declined to credit their testimony that their distress was caused only by the defendants' ads. Instead, the district court found that the individual plaintiffs' emotional distress partly was caused by viewing display ads that were not published by the defendants and that their distress was aggravated by their past experiences with, and heightened sensitivities to, racial discrimination. Seeid. at 1234. Finally, the district court found that the emotional distress sustained by the individual plaintiffs was not so severe as to justify a damage award larger than $2500 per person. Seeid.
 
 
 39
 Plaintiffs principally argue that the district court's damages award should be set aside for two reasons, neither of which we find persuasive. First, plaintiffs argue that, in discounting their past experiences with racial discrimination, the district court ignored the well-established principle of tort law that a tortfeasor "takes the plaintiff as he finds him." Maurer v. United States, 668 F.2d 98, 100 (2d Cir.1981) (per curiam); see also Restatement (Second) of Torts Sec. 435, at 454 (1965); W. Page Keeton et al., Prosser and Keeton on the Law of Torts Sec. 43, at 292 (5th ed. 1984). This argument ignores the fact that the "eggshell skull" doctrine has been applied only in cases where the plaintiff suffered physical injuries. See, e.g.,Munn v. Algee, 924 F.2d 568, 576 (5th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 277, 116 L.Ed.2d 229 (1991); Keeton et al., supra, Sec. 43, at 291 ("[t]he defendant is held liable when the defendant's negligence operates upon a concealed physical condition") (emphasis added).
 
 
 40
 Plaintiffs also argue that the district court's finding that they failed to establish a strong causal link between the distress they suffered as a result of viewing the defendants' ads and the distress they suffered as a result of viewing other ads was based on a misinterpretation of their testimony. In Ragin, we emphasized that "liability may not be based on an aggregation of advertisements by different advertisers." 923 F.2d at 1001-02. The district court's findings with respect to the issue of causation were based on its assessment of the plaintiffs' credibility. After reviewing the trial transcript, we see no basis for disturbing the district court's assessment of the plaintiffs' credibility. Cf.Morgan v. Secretary of Hous. & Urban Dev., 985 F.2d 1451, 1459-60 (10th Cir.1993) (ALJ's award of $5000 to FHA plaintiff for emotional distress not supported by substantial weight of the evidence where plaintiff failed to prove causal connection between distress and defendant's refusal to rent based on familial status).
 
 
 41
 In affirming the damages awarded by the district court for emotional distress, we echo the view expressed by the Ragin court that there exists a "potential for large numbers of truly baseless claims for emotional injury," that "there appears to be no ready device, other than wholly speculative judgments as to credibility, to separate the genuine from the baseless," and that it is the responsibility of district courts to "keep such awards within reason." 923 F.2d at 1005. Although the Ragin court expressed this view in the context of the potential for unreasonably high damage awards against newspapers, we find it pertinent to all section 804(c) cases in which plaintiffs recover damages only for emotional distress. Cf.Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc., 943 F.2d 644, 666 n. 12 (6th Cir.1991) (Keith, J., dissenting) (where an FHA violation is "based only upon the use of white models, individual emotional distress damages would, in the ordinary case, be too speculative as a matter of law").
 
 
 42
 Finally, we agree with the district court that the damages awarded were appropriate in light of the plaintiffs' failure to prove severe emotional distress. See 801 F.Supp. at 1234 ("[N]one of the Individual Plaintiffs fe[lt] further inhibited or deterred by his or her experience with these ads from seeking housing wherever desired[, and n]one sustained depression that has affected their relationships, ability to work or ability to function."). The damages awarded here were commensurate with those awarded in the only other reported section 804(c) case, seeSaunders, 659 F.Supp. at 1061 ($2500), and with those awarded in section 804(d) steering cases, where the causal connections between the defendants' acts and the plaintiffs' damages were never in doubt, see, e.g.,United States v. Balistrieri, 981 F.2d 916, 930-33 (7th Cir.1992) ($2000), petition for cert. filed, No. 92-1690, 61 U.S.L.W. 3742 (U.S. Apr. 19, 1993); Douglas v. Metro Rental Servs., Inc., 827 F.2d 252, 256-57 (7th Cir.1987) (damages awarded to plaintiffs remitted to $2500 per plaintiff because emotional distress was not severe); Hamilton v. Svatik, 779 F.2d 383, 388-89 (7th Cir.1985) (court affirms $12,000 damage award for emotional distress but emphasizes that award was "very close to being excessive"). Cf.Littlefield v. McGuffey, 954 F.2d 1337, 1348-49 (7th Cir.1992) ($50,000 emotional distress award upheld in FHA action where jury found defendant intentionally inflicted emotional distress and distress was severe); Secretary, United States Dep't of Hous. & Urban Dev. v. Blackwell, 908 F.2d 864, 872-73 (11th Cir.1990) ($40,000 award to FHA plaintiff for emotional distress affirmed where defendant refused to rent on the basis of race and where plaintiff's distress was severe enough to include physical manifestations).
 
 2. Damages Awarded to OHC
 
 43
 The OHC argues that the district court committed clear error in declining to award it damages to compensate it for the cost of the time and effort it must devote in the future to counteract the adverse effects of the defendants' ads. For example, Spiro testified that she would like to buy a full-page ad in The New York Times for $35,000 to inform the public that the defendants' ads are misleading and that people have the right to live where they want. The district court declined to compensate the OHC for these costs, finding that the OHC failed to establish that
 
 
 44
 its efforts to assist equal access to housing have been frustrated by the Defendants' ads.... [T]here was no evidence that the OHC was forced to increase its educational, counselling or referral services due to the Defendants' ads in particular.... [T]he OHC received no complaints about the Defendants' ads and Spiro conceded that she was unaware of the impact of Defendants' ads on anyone other than the Individual Plaintiffs.
 
 
 45
 801 F.Supp. at 1233. While the court in Saunders awarded the organizational plaintiff damages similar to those requested by the OHC, see 659 F.Supp. at 1060-61, we cannot say that Judge Sweet clearly erred in his analysis of the evidentiary record that was before him.
 
 D. Punitive Damages
 
 46
 Plaintiffs next argue that the district court erred in declining to award punitive damages. Punitive damages may be awarded for violations of federal law where a defendant acts with "reckless or callous disregard for the plaintiff's rights, [and] intentional[ly] violat[es] federal law." Smith v. Wade, 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983); seeBalistrieri, 981 F.2d at 936; see alsoSaunders, 659 F.Supp. at 1061 (plaintiffs must prove that defendants acted "wantonly or willfully or were motivated by ill will, malice, or a desire to injure the plaintiffs"). We review a district court's decision not to award punitive damages for abuse of discretion. McCann v. Coughlin, 698 F.2d 112, 127 (2d Cir.1983).
 
 
 47
 In declining to award punitive damages, the district court held that the absence of any intent to discriminate on the part of the defendants in placing the ads precluded, as a matter of law, "a finding of wanton, willful or malicious behavior." 801 F.Supp. at 1235. The district court also found that the defendants' continued use of display advertisements that failed to include any black models after the SDHR determination of probable cause did not constitute a reckless or callous disregard for plaintiffs' rights or an intentional violation of federal law. Seeid. The district court based this conclusion on the facts that: (1) the issuance of a determination of probable cause was not dispositive of whether a federal right was violated because it merely concluded that "no Blacks were used as human models" and that probable cause existed to support the allegations in the administrative complaint; (2) Macklowe subsequently consulted with HMRE's in-house counsel to determine whether HMRE had violated any federal laws; and (3) HMRE, after it received notice of the administrative complaints, "included an Equal Housing Opportunity logo in [its] print and bus ads and included a verbal advisory to this effect in radio ads." Id. Based on the above analysis, the district court did not abuse its discretion in declining to award punitive damages.
 
 E. Injunctive Relief
 
 48
 The district court's injunction prohibited the defendants from continuing to use advertisements that "violate[ ] [the FHA], and indicate[ ] to the ordinary reader any preference, limitation or discrimination based upon race or color, or an intention to make such preference, limitation or discrimination or that the housing or dwelling being advertised is not open to all without regard to race or color." We review the scope of a district court's injunction for abuse of discretion. Nikon Inc. v. Ikon Corp., 987 F.2d 91, 94 (2d Cir.1993).
 
 
 49
 The plaintiffs argue that the injunction was inadequate because it did not require that "the models should be clearly definable as reasonably representing majority and minority groups in the metropolitan area," Appellants' Brief at 35 (quoting 24 C.F.R. Sec. 109.30(b)) (emphasis added in Appellants' Brief), and because it did not require that defendants' ads include the Equal Housing Opportunity logo, as required by 24 C.F.R. Sec. 109.30(a). Notwithstanding plaintiffs' contention that these provisions often are included in consent decrees resolving section 804(c) litigation, we do not believe the district court abused its discretion in declining to include the requested HUD regulation language or logo in the injunction. As the district court wisely observed, entering an injunction requiring the use of proportional representation for blacks in real estate display advertising would put district courts in the position of becoming "an abettor to discrimination against other groups." 801 F.Supp. at 1236.
 
 
 50
 The plaintiffs also criticize the injunction for failing to "set any standard to constrain or guide the defendants with regard to future all-white advertising programs" and for acting as "an invitation to future litigation." Appellants' Brief at 34; see Fed.R.Civ.P. 65(d) (injunction must "describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained"). This argument might have merit if it were being made by the defendants. See, e.g.,International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 74, 88 S.Ct. 201, 206, 19 L.Ed.2d 236 (1967); Keyes v. School Dist. No. 1, Denver, Colo., 895 F.2d 659, 668 (10th Cir.1990), cert. denied, 498 U.S. 1082, 111 S.Ct. 951, 112 L.Ed.2d 1040 (1991). However, in the absence of a claim by the defendants that the injunction regulating their future conduct is vague and impossible to follow, and given the plaintiffs' ability to bring contempt proceedings if the defendants fail to comply with the injunction, see, e.g.,Still's Pharmacy, Inc. v. Cuomo, 981 F.2d 632, 635 (2d Cir.1992), we cannot find an abuse of discretion on the part of the district court.
 
 F. Attorneys' Fees
 
 51
 Finally, the plaintiffs argue that the district court erred in declining to award them attorneys' fees. Prior to 1988, a district court could award attorneys' fees to a prevailing plaintiff in an FHA action if the plaintiff was "not financially able to assume said attorney's fees." 42 U.S.C. Sec. 3612(c) (1982) (the "unamended statute"). The amendments to the FHA, signed into law on September 13, 1988, and effective 180 days later on March 18, 1989, provide that a district court "in its discretion, may allow the prevailing party ... a reasonable attorney's fee and costs." 42 U.S.C. Sec. 3613(c)(2) (1988) (the "amendment").
 
 
 52
 Although the district court did not hold a separate hearing on the issue of attorneys' fees, it declined to award attorneys' fees to the plaintiffs, apparently basing its decision on some evidence of the financial situation of the plaintiffs that was adduced at trial. In its one-and-a-half-page order declining to award attorneys' fees, the district court stated: "In view of the evidence concerning the financial ability of the plaintiffs ... and the nature of the action and the relief granted, ... counsel fees are not necessary or appropriate to further the purposes of the Fair Housing Act...." The district court's reference to the "financial ability of the plaintiffs" indicates that it was applying the unamended statute to all legal work performed. Because this action was commenced before the effective date of the amendment and was concluded after that date, we will address separately the district court's decision to apply the unamended statute to legal work performed both before and after the effective date of the amendment.
 
 
 53
 1. Legal Services Rendered After the Effective Date of the Amendment
 
 
 54
 In declining to apply the amendment prospectively to legal services rendered subsequent to the effective date of the amendment, the district court apparently reasoned that, because this action was filed prior to the effective date of the amendment, all legal work performed in the case "related back" to the filing date. In Morgan Guaranty Trust Co. v. Republic of Palau, 971 F.2d 917, 922 (2d Cir.1992), we held that attorneys' fees may be awarded for services performed subsequent to the effective date of a statute that authorized the award of such fees even though the action had been commenced before the effective date of the statute. Thus, the district court improperly declined to apply the amendment in determining whether plaintiffs were entitled to attorneys' fees for legal work performed after the effective date of the amendment, and it must make such a determination on remand.
 
 
 55
 2. Legal Services Rendered Prior to the Effective Date of the Amendment
 
 
 56
 The issue of whether the amendment should be applied retroactively is one of first impression in this Circuit. HUD recommends that the amendment be applied retroactively, see 54 Fed.Reg. 3232, 3259 (1989), and one of our sister circuits has adopted that recommendation, seeLittlefield, 954 F.2d at 1345. In Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. 827, 837, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990), the Supreme Court noted, but failed to resolve, the tension in its retroactivity jurisprudence. CompareBradley v. School Bd. of City of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) (court should "apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary") withBowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) ("Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."). Recently, in Butts v. City of New York Department of Housing Preservation & Development, 990 F.2d 1397, 1409-11 (2d Cir.1993), we decided to adopt the retroactivity rule articulated in Bowen. Thus, the district court properly declined to apply the amendment retroactively to legal work performed prior to the effective date of the amendment.
 
 
 57
 Even though the district court properly applied the unamended statute to legal services performed prior to the effective date of the amendment, it nevertheless erred in declining to award fees on the basis of the plaintiffs' ability to pay, given the limited evidence that was adduced at trial and the expectations of the parties that further proceedings would be conducted on this issue. For example, although the plaintiffs testified about their household incomes, no evidence was presented that would have allowed the district court to compare the plaintiffs' net worth with the amount of the fee request. SeeJohnson v. New York City Transit Auth., 823 F.2d 31, 33 (2d Cir.1987) (per curiam); Faraci v. Hickey-Freeman Co., 607 F.2d 1025, 1028-29 (2d Cir.1979). The proposed judgments submitted by the parties indicated that they contemplated that further proceedings on the issue of attorneys' fees would take place in the future. In the absence of such proceedings, a remand is required also to determine whether the plaintiffs met the criteria established in the unamended statute for attorneys' fees incurred prior to the effective date of the amendment.
 
 CONCLUSION
 
 58
 The district court's findings with respect to standing, liability, damages and injunctive relief are affirmed. The district court's findings with respect to the award of attorneys' fees are reversed and remanded for further proceedings consistent with the foregoing.
 
 
 
 *
 Hon. Jacob Mishler, Senior District Judge of the United States District Court for the Eastern District of New York, sitting by designation
 
 
 [1]
 The Organization is a trade name and has been dismissed from this action. See 801 F.Supp. at 1225 n. 3
 
 
 [2]
 According to Mrs. Cuyler, she and her husband were looking for real estate investments when they saw the defendants' ads in The New York Times. Mr. Ragin testified that he and his wife began checking into the availability of New York apartments in July of 1985 while they were living in London. By the time the first ad for Riverterrace ran in May of 1986, the Ragins had signed a subscription agreement to purchase a co-op. However, the Ragins continued actively to look for an apartment until the fall of 1986, when a dispute over whether their building would be converted into a co-op was settled. By this time, the HOME ad for Riverterrace had been published in the May 11, 1986 edition of the Times. After they purchased their co-op, the Ragins continued to read the real estate ads and signed a contract to purchase a ski home in Windham, New York in 1991, although they eventually decided not to make the purchase