20-1998-cv
*Connecticut Parents Union v. Russell-Tucker et al.*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2020

No. 20-1998-cv

CONNECTICUT PARENTS UNION,
*Plaintiff-Appellant*,

v.

CHARLENE RUSSELL-TUCKER, in her official capacity as Acting
Commissioner, Connecticut State Department of Education, ALLAN B.
TAYLOR, in his official capacity as Chairperson of the Connecticut
State Department of Education's State Board of Education, NED
LAMONT, in his official capacity as Governor of Connecticut, WILLIAM
TONG, in his official capacity as Connecticut Attorney General,
*Defendants-Appellees*,[*]

On Appeal from the United States District Court
for the District of Connecticut

---

[*] Under Fed. R. App. P. 43(c), Charlene Russell-Tucker is, in her official capacity as Acting Commissioner of Education, substituted for her predecessor Diana Wentzell. The Clerk of Court is directed to amend the caption as shown above.

ARGUED: JANUARY 25, 2021
DECIDED: AUGUST 11, 2021
AMENDED OPINION FILED: AUGUST 18, 2021

Before: CABRANES and LYNCH, *Circuit Judges*, and MARRERO, *District Judge*.[†]

The question presented is whether the United States District Court for the District of Connecticut (Stefan R. Underhill, *Chief Judge*) properly dismissed the Complaint of Plaintiff-Appellant Connecticut Parents Union ("CTPU") for lack of Article III standing. In its Complaint, CTPU alleged that Connecticut's standards regarding the racial composition of its interdistrict magnet schools violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Because CTPU is an organization that is not directly

---

[†] Judge Victor Marrero, of the United States District Court for the Southern District of New York, sitting by designation.

regulated or affected by the challenged standards and because CTPU has failed to show that it suffered an involuntary, material burden on its core activities, we conclude that CTPU has not established an injury-in-fact for purposes of demonstrating organizational standing. Accordingly, we hold that the District Court properly dismissed the Complaint and we **AFFIRM** the judgment of the District Court.

CHRISTOPHER M. KIESER, (Oliver J. Dunford, Sacramento, CA, *on the brief*), Pacific Legal Foundation, Palm Beach, FL, *for Plaintiff-Appellant*.

DARREN P. CUNNINGHAM, Assistant Attorney General (Clare E. Kindall, Solicitor General, *on the brief*), *for* William Tong, Attorney General, Hartford, CT, *for Defendants-Appellees*.

JOSÉ A. CABRANES, *Circuit Judge*:

The question presented is whether the United States District Court for the District of Connecticut (Stefan R. Underhill, *Chief Judge*) properly dismissed the Complaint of Plaintiff-Appellant Connecticut Parents Union ("CTPU") for lack of Article III standing. In its Complaint, CTPU alleged that Connecticut's standards regarding the racial composition of its interdistrict magnet schools violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Because CTPU is an organization that is not directly regulated or affected by the challenged standards and because CTPU has failed to show that it suffered an involuntary, material burden on its core activities, we conclude that CTPU has not established an injury-in-fact for purposes of demonstrating organizational standing. Accordingly, we hold that the District Court properly dismissed the Complaint and we **AFFIRM** the judgment of the District Court.

# I. BACKGROUND

The following facts are principally drawn from the Complaint, construed in the light most favorable to CTPU as the non-moving party.[1]

On October 23, 2017, Dianna Wentzell, the Commissioner of the Connecticut State Department of Education (the "Commissioner") issued a memorandum (the "2017 RIS Memorandum"), which implemented so-called "reduced-isolation setting standards" (the "2017 RIS") for Connecticut's interdistrict magnet schools pursuant to Conn. Gen. Stat. ("CGS") §§ 10-264*l* and 10-264r.[2] The 2017 RIS

---

[1] We also refer to the transcript of a December 5, 2019 hearing before the District Court on Defendants-Appellees' March 26, 2019 motion to dismiss the Complaint ("Hearing Tr.").

[2] In pertinent part, CGS § 10-264*l* defines an interdistrict magnet school program as follows: "[A] program which (i) supports racial, ethnic and economic diversity, (ii) offers a special and high quality curriculum, and (iii) requires students who are enrolled to attend at least half-time. An interdistrict magnet school program does not include a regional agricultural science and technology school, a technical education and career school or a regional special education center."

Memorandum required that all interdistrict magnet schools in Connecticut enroll at least 25% non-Black and non-Hispanic students on pain of financial penalties.[3]

CTPU is a nonprofit advocacy group founded in 2011 "to ensure that parents, guardians, and families are connected with the educational resources and support system necessary to protect their children's educational rights thus ensuring that neither race, zip-code, nor socio-economic status is a predictor of a child's success."[4] CTPU alleges that, after the implementation of the 2017 RIS (which CTPU pointedly describes as a "hard racial quota"[5]), its president,

---

[3] The 2017 RIS Memorandum provided that "[t]he Commissioner may impose a financial penalty on the operator (up to the magnet grant amount) of an interdistrict magnet school that does not meet the RIS for two consecutive years, or take other measures, in consultation with such operator, to assist the operator in complying with the applicable standard." CTPU App'x at 27 (emphasis in original). In January 2020, the District Court approved a settlement that eliminated racial standards for magnet schools in the Hartford area. *See Robinson v. Wentzell*, No. 18-cv-00274-SRU (D. Conn. terminated Jan. 29, 2020).

[4] Complaint ¶ 6 (internal quotation marks omitted).

[5] *Id.* ¶ 1.

Gwendolyn Samuel, "received many phone calls from . . . parents across the state" including "Black or Hispanic parents who were concerned that their children did not get into one of the magnet schools and sought guidance from [CTPU]."[6]

CPTU has vigorously protested the 2017 RIS, including by "host[ing] community events, information sessions, bus tours, and other events in order to educate the public about the statewide racial quota's harmful effects" and "lead[ing] legislative-reform efforts to repeal the racial quota."[7] CTPU alleges that its "attempts to counteract the statewide quota . . . have 'prevented [it] from devoting [its] time and energies to other . . . matters,'" imposing "opportunity costs" on the organization.[8]

---

[6] CTPU Opening Br. at 14-15 (citing Hearing Tr. 32-34 (CTPU App'x at 57-60)).

[7] Complaint ¶ 6.

[8] CTPU Opening Br. at 20 (quoting *Ragin v. Harry Macklowe Real Est. Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (first ellipses added)).

On February 20, 2019, CTPU filed this Complaint against Defendants-Appellees the Commissioner; Allan B. Taylor, the Chairperson of the Connecticut State Department of Education's State Board of Education; Ned Lamont, Governor of Connecticut; and William Tong, the Connecticut Attorney General (together, the "State"), bringing a constitutional claim under Section 1983 of the Civil Rights Act of 1866.[9] CTPU alleges that the 2017 RIS created a 75% "cap"[10] on Black and Hispanic students, which denies those students equal protection of the laws under the Fourteenth Amendment. In its Complaint, CTPU seeks declaratory and injunctive relief, as well as attorneys' fees and costs.

---

[9] 42 U.S.C. § 1983. The Complaint also refers to 42 U.S.C. § 1981, but states a single claim for relief, asserted against Defendants-Appellees in their official capacities. Complaint ¶¶ 35-46. Like the District Court, we construe CTPU's claim as arising under Section 1983. *See Connecticut Parents Union v. Wentzell*, 462 F. Supp. 3d 167, 171 (D. Conn. 2020) ("CTPU challenges the Act's implementation pursuant to 42 U.S.C. § 1983 on the ground that it violates the Fourteenth Amendment's Equal Protection Clause.").

[10] Complaint ¶ 15.

The State moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1), arguing that CTPU lacked standing to bring the action. The District Court granted the State's motion on May 26, 2020 and dismissed the Complaint without prejudice, holding that CTPU had "not plausibly alleged that it suffered an injury 'fairly traceable' to [CGS §§ 10-264*l* and 10-264r] or to actions of the [State]."[11] Judgment entered on May 27, 2020, and CTPU timely appealed.

On August 19, 2020 (the day after CTPU filed its opening brief on appeal), the Commissioner issued a new memorandum (the "2020 RIS Memorandum"), which maintained the race-based admission standards for Connecticut's interdistrict magnet schools but eliminated monetary penalties and (assertedly) any other "negative consequences" for non-compliance with those RIS standards.[12] On

---

[11] *Wentzell*, 462 F. Supp. 3d at 172.

[12] Memorandum of Miguel A. Cardona, Connecticut Comm'r of Educ. on Interdistrict Magnet Schools Reduced Isolation Standards (Aug. 19, 2020) ("If an interdistrict magnet school does not meet the applicable RIS standard promulgated

appeal, in addition to arguing that CTPU lacks standing, the State

argues the issuance of the 2020 RIS Memorandum moots this appeal.

## II. DISCUSSION

"A district court properly dismisses an action under Fed. R. Civ.

P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the

statutory or constitutional power to adjudicate it," such as when "the

plaintiff lacks constitutional standing to bring the action."[13] We review

*de novo* a district court's dismissal of a complaint for lack of standing,

---

by the Commissioner, there shall not be any negative consequences for any school, school operator, or the State Department of Education . . . . However, schools must be operating pursuant to an approved compliance plan designed to bring the school population into compliance with the standards outlined herein and maximize (a) reduced-isolation educational opportunities; and/or (b) opportunities in settings with evidence of other indices of diversity, including but not limited to, racial, geographic, socioeconomic, percentage of special education students and English Learner students, achievement and other factors. An interdistrict magnet school that does not meet the 75% Residency Standard as set forth herein, must be operating pursuant to an approved compliance plan designed to bring the school into compliance with the residency enrollment requirements in order to remain eligible for the interdistrict magnet operating grant."). CTPU suggests that the retention of racial standards in the 2021 RIS memorandum is sufficient to impose a legally cognizable injury.

[13] *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l*, 790 F.3d 411, 416-17 (2d Cir. 2015) (internal citations and quotation marks omitted).

10

"construing the complaint in plaintiff's favor and accepting as true all material factual allegations contained therein."[14] Nonetheless, a plaintiff asserting standing must "allege facts that affirmatively and plausibly suggest that it has standing to sue" and courts "need not credit a complaint's conclusory statements without reference to its factual context."[15] We may "consider affidavits and other materials beyond the pleadings"[16] relied upon by the District Court below to resolve the issue of standing.

Organizations like CTPU may have standing in one of two ways: by establishing so-called "associational" or "representational" standing to sue on behalf of its members, or by establishing that it was

---

[14] *Katz v. Donna Karan Co.*, 872 F.3d 114, 118 (2d Cir. 2017) (internal quotation marks omitted); *see also Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012) (when reviewing the dismissal of a complaint for lack of jurisdiction, "we review factual findings for clear error and legal conclusions *de novo*, accepting all material facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor.").

[15] *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145-46 (2d Cir. 2011).

[16] *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).

directly injured as an organization.[17] Here, CTPU does not assert representational standing, and alleges only direct injury to itself as an organization. To succeed on that theory, it is CTPU's burden to satisfy the "irreducible constitutional minimum of standing"[18] by showing: "(i) an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable; (ii) that its injury is fairly traceable to [the challenged act]; and (iii) that a favorable decision would redress its injuries."[19]

---

[17] *Compare Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (describing criteria for associational or representational standing), *with Warth v. Seldin*, 422 U.S. 490, 511 (1992) (observing that an organization can "have standing in its own right").

[18] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

[19] *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (internal quotation marks omitted).

We note that although the District Court held that CTPU failed to establish the second of these elements (that is, causation, or "traceability"), the parties agree that our standing inquiry here turns principally on the first element: injury-in-fact. We agree with CTPU that "injury and causation are often entangled," for instance, when "[t]he question whether an organization has suffered an opportunity cost [and thus a legal injury]" is in many cases "intertwined with the question whether the organization was 'compelled' to expend resources. . . ." CTPU Opening Br. at 27 n.3. The connection between injury and causation is particularly close where, as here, the plaintiff is not the object of the challenged legislation and is therefore not

An organization can satisfy the injury prong if it shows that the challenged action did not merely harm its "abstract social interests" but "perceptibly impaired" its activities.[20] We have made clear that an organization may suffer the requisite injury when it "diverts its resources away from its [other] current activities," or otherwise incurs "some perceptible opportunity cost."[21]

Here, CTPU maintains that its work was perceptibly impaired because "it expend[ed] resources to counteract illegal activity touching on its core mission"[22] and in so doing "divert[ed] resources away from other activities."[23] CTPU thus argues that it sufficiently pleaded an

---

under any direct physical or legal compulsion that would require it to incur costs constituting an injury. But here, because we conclude that CTPU fails to demonstrate injury-in-fact, consideration of the injury prong is sufficient to resolve the dispute before us.

[20] *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

[21] *Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 129-30 (2d Cir. 2020). It follows that expenditures may satisfy the injury prong even if there is no increase in the organization's *total* expenditures.

[22] CTPU Reply Br. at 7.

[23] *Id*. at 13.

injury-in-fact on the basis of the "opportunity costs" to the organization from its "attempts to counteract the statewide quota . . . [that] have 'prevented [it] from devoting [its] time and energies to other . . . matters[.]'"[24]

We disagree. Under CTPU's argument, an organization could establish standing by claiming to have been injured by any law or regulation touching any issue within the scope of its mission (which the organization itself can define) so long as it expends resources to oppose that law or regulation. For example, under CTPU's theory of organizational standing, CTPU would be able to successfully plead an injury simply by pointing to any Connecticut law relating to education that it makes a significant effort to oppose.

Accordingly, we reject such an expansive concept of organizational injury for standing purposes. We have held that where,

---

[24] CTPU Opening Br. at 20 (quoting *Ragin v. Harry Macklowe Real Est. Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (first ellipses added)).

as here, an organization is not directly regulated by a challenged law or regulation, it cannot establish "perceptible impairment"[25] absent an involuntary material burden on its established core activities. In other words, the challenged law or regulation must impose a cost (*e.g.*, in time, money, or danger) that adversely affects one of the activities the organization regularly conducted (prior to the challenged act) in pursuit of its organizational mission. For example, we have recognized that a cognizable injury may arise via a burden that is imposed on an organization when there is an increased demand for an organization's services.[26] But we think that expenditures or other activities, if

---

[25] *Havens*, 455 U.S. at 379.

[26] *See, e.g., New York State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 956 (2020) (an organization promoting the interests of adoptive and foster families was injured by nonpayment of child-maintenance funds to families when it spent "hundreds of hours" fielding "phone calls from aggrieved foster families"); *see also New York v. United States Dept. of Homeland Sec.*, 969 F.3d 42, 60-61 (2d Cir. 2020) (an organization providing legal and social services to non-citizens was injured by a new rule that increased demand for its services and necessitated costly changes to its education programs); *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (taxi-driver union was injured by summary suspension of drivers' licenses because the expenditure of resources to assist suspended drivers (through counseling and referrals to attorneys) constituted an "opportunity cost").

incurred at the organization's own initiative, cannot support a finding of injury—that is, when the expenditures are not reasonably necessary to continue an established core activity of the organization bringing suit, such expenditures, standing alone, are insufficient to establish an injury in fact for standing purposes. In other words, an organization's decision to embark on categorically new activities in response to action by a putative defendant will not ordinarily suffice to show an injury for standing purposes, even if the organization's own clients request the change.

This analysis of organizational injury coheres with our decision in *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,[27] on which CTPU heavily relies. In *Centro*, we held that an entity with a mission of "end[ing] the exploitation of Latino immigrant workers" and promoting the social integration of those workers by means of "community organizing, legal support, education,

---

[27] 868 F.3d 104.

16

leadership development, and building worker cooperatives"[28] had sufficiently shown it had suffered an organizational injury from an ordinance that banned soliciting employment on a public right-of-way.

In concluding that the organization had suffered a cognizable injury in *Centro*, we noted three ways in which the entity's core activities were burdened by the challenged ordinance: (i) the ordinance would require the physical dispersal of laborers, which would impede organizing activity, one of the entity's primary "responsibilities";[29] (ii) the entity would have to "divert resources from other of its activities to combat the effects of the [challenged] [o]rdinance"[30]—*i.e.*, the entity would have to expend additional resources to continue organizing after the forced dispersal of the

---

[28] *Id*. at 109.

[29] *Id*. at 110.

[30] *Id*.

17

laborers;[31] (iii) the entity's members would face the risk of "erroneous arrest" while conducting "advocacy activities" among the laborers, since those officials enforcing the challenged ordinance might not distinguish advocates from laborers.[32]

Our analysis in *Centro* demonstrates that the injury-in-fact inquiry should focus on the *involuntary* and *material* impacts on *core activities* by which the organizational mission has historically been carried out.

Applying the principles we have stated, we conclude that CTPU has not met its burden to show an injury in fact. CTPU speaks loosely of its expenditures to counteract activity—that is, the 2017 RIS— "touching on" its "core mission,"[33] but fails to identify any restrictions

---

[31] *Id*. ("[I]t is also clear that the Ordinance will force [the organization] to divert money from its other current activities to advance its established organizational interests (*i.e.*, if the laborers are dispersed, it will be more costly to reach them).").

[32] *Id*. at 111 (internal quotation marks omitted).

[33] CTPU Reply Br. at 7.

18

on its ability to perform the core activities—such as meetings, lectures, and general organizing—by which it pursued its mission prior to the 2017 RIS. To the extent CTPU claims that the 2017 RIS triggered an increased demand for parent counseling, CTPU fails to sufficiently plead that any resulting costs were *material*.[34] Further, even construing the record in CTPU's favor, as we must, it is clear that CTPU incurred

---

[34] We note that the record suggests that CTPU's counseling activities, at least prior to the 2017 RIS, were incidental and occasional, not "core." *See* Hearing Tr. 31:11-16 (CTPU App'x at 56) ("So we're not counselors, per se. We consult with attorneys, constitutional attorneys, people that are educators. So we consult with other experts that can help the parent . . . ."). For example, before the District Court, the CTPU President, Ms. Samuel, said she fielded "maybe about 15" telephone calls regarding the 2017 RIS quotas. Hearing Tr. 31:4-5 (CTPU App'x at 56). Such a number of calls falls far short of, for example, the "hundreds of hours" of phone calls found sufficient to show injury in comparable cases. *Poole*, 922 F.3d at 75; *see also* Note 26, *ante*. Even if some parents welcomed or even requested some of the costly community organizing and advocacy that ensued, CTPU has not shown that any of these activities were reasonably required to handle a surge of parental requests for advice. During oral argument on Defendants-Appellees' motion to dismiss, Ms. Samuel (speaking at the invitation of the District Court) asserted that CTPU began hosting community meetings because she "couldn't serve . . . all [the concerned parents], even with our volunteer network." Hearing Tr. 31:17-18 (CTPU App'x at 56). Ms. Samuel's assertion (which was not made under oath and does not correspond to anything in the Complaint or her Declaration of April 9, 2019) is too vague and conclusory to support a finding of injury-in-fact. *See, e.g., J.S. ex rel N.S.*, 386 F.3d at 110 ("We may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but we may not rely on conclusory . . . statements . . . .").

19

costs because it decided to initiate a campaign against the 2017 RIS to advance its own "abstract social interests";[35] thus any costs CPTU incurred from this campaign were not *involuntary*. Accordingly, because CTPU has not shown an injury in fact, we hold that CTPU lacks organizational standing.

As a final matter, because we hold that CTPU lacks Article III standing, we need not consider the State's contention that the issuance of the 2020 RIS mooted CTPU's claims.[36]

### III. CONCLUSION

To summarize: we hold that an organization that is not directly regulated or affected by a challenged law or regulation cannot establish injury-in-fact for purposes of organizational standing absent

---

[35] *Havens Realty*, 455 U.S. at 379.

[36] *See, e.g.*, *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584-85 (1999) (holding that, because the principle that jurisdictional questions must be resolved before merits issues "does not dictate a sequencing of jurisdictional issues," a court may "choose among threshold grounds for denying audience to a case on the merits").

a showing that it suffered an involuntary and material burden on its established core activities. Because CTPU has not made this required showing, the District Court properly dismissed the Complaint for lack of standing without prejudice.[37] We thus **AFFIRM** the judgment of the District Court.

---

[37] *See, e.g.*, *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54–55 (2d Cir. 2016) ("[W]here a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice. Such a dismissal is one for lack of subject matter jurisdiction and without jurisdiction, the district court lacks the power to adjudicate the merits of the case. Accordingly, where there is a lack of Article III standing, Article III deprives federal courts of the power to dismiss a case with prejudice." (internal citations and quotation marks omitted)).